SARAH R. HACOBIAN, ESQ. (SBN 340443)
SRH Law Group, APC
440 Western Ave. Suite 205
Glendale, CA 91201
Telephone: (818) 669-8522
SRHlawgroup@outlook.com
Attorney for Petitioner

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **VLADISLAV KRASNOV,** | Case No.: |
| **Petitioner,** | |
| **v.** | **PETITION FOR WRIT OF HABEAS CORPUS (28 U.S.C. § 2241), AND DECLARATORY AND INJUNCTIVE RELIEF** |
| **KRISTI NOEM, Secretary, U.S. Department of Homeland Security; [WARDEN / FACILITY ADMINISTRATOR], Adelanto ICE Processing Center / Desert View Annex; TODD M. LYONS, Senior Official Performing the Duties of the Director, U.S. Immigration and Customs Enforcement; FIELD OFFICE DIRECTOR, ICE Enforcement and Removal Operations, Los Angeles; and DOES 1–10, in their official capacities,** | |
| **Respondents.** | |

1

## INTRODUCTION

Petitioner Vladislav Krasnov ("Petitioner") respectfully petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 challenging his ongoing civil immigration detention by the Department of Homeland Security ("DHS") and Immigration and Customs Enforcement ("ICE").

Petitioner is a 27-year-old citizen of Russia who entered the United States on or about August 8, 2023, and applied for admission at San Ysidro, California. He subsequently applied for asylum and related protection. On March 1, 2024, an Immigration Judge denied asylum and ordered removal.

Petitioner continued to pursue relief. Most recently, through counsel, he filed a Motion to Reopen before the Board of Immigration Appeals ("BIA"), which remains pending. On March 9, 2026, the BIA granted an emergency stay of removal.

Petitioner was detained by ICE on February 11, 2026, during a routine check-in in Los Angeles. On March 9, 2026—while at an airport in Louisiana being placed on a plane for removal—the BIA stay issued, and he was returned to detention.

Despite the stay, the pending Motion to Reopen, and Petitioner's serious medical condition, ICE continues to detain him without any constitutionally adequate individualized custody determination.

2

PETITION FOR WRIT OF HABEAS CORPUS (28 U.S.C. § 2241), AND DECLARATORY AND INJUNCTIVE RELIEF

Petitioner suffers from vitiligo, an autoimmune disease, and his condition has worsened in detention due to interruption of treatment.

Petitioner seeks immediate release, or alternatively, a prompt individualized custody determination with constitutionally adequate safeguards, including meaningful consideration of alternatives to detention.

## CUSTODY

1. Petitioner is currently detained at the Adelanto ICE Processing Center Desert View Annex in Adelanto, California.

2. Petitioner is in the physical custody of the Warden / Facility Administrator of that facility, who is his immediate custodian.

## JURISDICTION AND VENUE

3. This Court has jurisdiction under 28 U.S.C. § 2241 because Petitioner is in federal custody within this District and challenges the legality of that custody.

4. Jurisdiction also lies under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.

5. Petitioner challenges only the legality of his detention—not the underlying removal order—and thus his claims are properly brought in habeas.

6. This Court has authority under 28 U.S.C. § 2241 and the All Writs Act, 28 U.S.C. § 1651.

7. Venue is proper because Petitioner is detained within this District and his

PETITION FOR WRIT OF HABEAS CORPUS (28 U.S.C. § 2241), AND DECLARATORY AND

INJUNCTIVE RELIEF

custodian is located here.

## PARTIES

8.  Petitioner Vladislav Krasnov is a 27-year-old native and citizen of Russia, born June 1998.

9.  Respondent Warden / Facility Administrator of the Adelanto ICE Processing Center is Petitioner's immediate custodian.

10. Respondent Kristi Noem, Secretary of DHS, has authority over immigration detention.

11. Respondent Todd M. Lyons, Acting ICE Director, oversees immigration enforcement and detention operations.

12. Respondent Field Office Director, ICE Los Angeles, has authority over Petitioner's detention.

13. Respondents DOES 1–10 are unknown officials responsible for Petitioner's detention and attempted removal.

## FACTUAL BACKGROUND

14. Petitioner is a native and citizen of Russia.

15. He entered the United States on August 8, 2023, at San Ysidro, California.

16. DHS issued a Notice to Appear alleging that Petitioner lacked valid entry documents. **(EXH B)**

17. Petitioner applied for asylum and related relief.

4

PETITION FOR WRIT OF HABEAS CORPUS (28 U.S.C. § 2241), AND DECLARATORY AND

INJUNCTIVE RELIEF

18. On March 1, 2024, an Immigration Judge denied asylum and ordered removal.

19. Petitioner pursued further review before the BIA and the Fifth Circuit.

20. New immigration Counsel, Wallie Mason, esq. of Mason Immigration Law Office was retained on February 7, 2026.

21. On February 11, 2026, Petitioner was detained by ICE during a check-in in Los Angeles. **(EXH C)**

22. On or about February 12, 2026, his prior release was revoked. **(EXH C)**

23. Petitioner filed a Motion to Reopen with the BIA on or about February 27, 2026. **(EXH D)**

24. Petitioner then supplemented his Motion to Reopen with the BIA. 2026. **(EXH E)**

25. That Motion to Reopen remains pending.

26. On March 9, 2026, the BIA granted an emergency stay of removal. **(EXH F)**

27. At the time the stay issued, Petitioner was at an airport in Louisiana being placed on a plane for removal.

28. After the stay issued, he was returned to detention instead of removed.

29. Petitioner has no prior criminal history, has no record of failing to appear for

5

any immigration proceedings or required check-ins, and has no history of posing a danger to any person or property. His record reflects consistent compliance and further demonstrates that he is neither a flight risk nor a danger to the community.

*Medical Condition and Irreparable Harm*

28. Petitioner suffers from vitiligo, an autoimmune disease.

29. Prior to detention, he received regular treatment through Pacific Skin Institute. **(EXH G)**

30. That treatment helped manage his condition.

31. Medical records from prior detention (2024–2025) show repeated efforts to obtain care, including for eye-related symptoms. **(EXH G)**

32. Since re-detention, Petitioner reports worsening symptoms and spreading skin discoloration.

33. His detention has interrupted necessary medical care.

34. His condition is deteriorating in custody.

35. This constitutes ongoing and irreparable harm.

*Community Ties and Release Plan*

36. Petitioner is 27 years old, unmarried, and has no children.

37. Prior to detention, he lived in a shared apartment in West Hollywood.

38. He can return to that residence upon release.

39. Following his prior release from immigration detention in 2024, Petitioner

PETITION FOR WRIT OF HABEAS CORPUS (28 U.S.C. § 2241), AND DECLARATORY AND INJUNCTIVE RELIEF

remained actively engaged in the community as a volunteer with Russian America for Democracy in Russia ("RADR"), an organization that supports Russian pro-democracy and anti-war asylum seekers in the United States. Through his involvement, Petitioner provided assistance and support to individuals in similar circumstances, demonstrating a strong commitment to community service and civic engagement. Petitioner has played a meaningful role in supporting others navigating the asylum process and has been a positive and reliable presence within that community. A letter of support from the President of RADR further attests to Petitioner's character, contributions, and community ties. **(EXH H)**

40. Petitioner has also volunteered with the Russian Seattle for Freedom organization, where he assisted individuals facing similar immigration and humanitarian challenges. Through this work, Petitioner demonstrated continued commitment to supporting others and maintaining strong community ties. The organization has expressed its willingness, upon Petitioner's release, to provide him with stable housing, cultural and social integration, language orientation support, and ongoing community support. A letter from the President of Russian Seattle for Freedom attests to Petitioner's involvement, character, and the organization's commitment to assisting him upon release. **(EXH H)**

41. He has a stable release plan and housing.

7

PETITION FOR WRIT OF HABEAS CORPUS (28 U.S.C. § 2241), AND DECLARATORY AND INJUNCTIVE RELIEF

42. He is able and willing to comply with any conditions of supervision. **(EXH H)**

*Lack of Legitimate Detention Purpose*

43. Petitioner's removal is currently stayed.

44. His Motion to Reopen remains pending.

45. ICE has continued detention without meaningful custody review.

46. No individualized determination has assessed his current risk or alternatives to detention.

47. ICE's decision to re-detain Petitioner—after previously releasing him following over 444 days of detention and a demonstrated period of full compliance—confirms that continued detention is not reasonably related to any legitimate regulatory purpose.

48. Continued detention under these circumstances is arbitrary and excessive.

*Cumulative Detention, Prior Release, and Demonstrated Compliance Render Continued Detention Excessive and Unnecessary*

49. Petitioner's current detention cannot be evaluated in isolation. Rather, it must be considered in light of his prior, prolonged immigration detention arising from the same underlying proceedings.

50. Petitioner was initially detained on or about August 8, 2023, after presenting himself for inspection at the border pursuant to the CBP One appointment process.

PETITION FOR WRIT OF HABEAS CORPUS (28 U.S.C. § 2241), AND DECLARATORY AND INJUNCTIVE RELIEF

51. He remained in immigration detention for approximately 444 days, until his release on October 24, 2024. **(EXH I)**

52. Petitioner's release was not based on any finding that he posed a danger or flight risk. Instead, he was released by order of the government in connection with litigation challenging unlawful and prolonged detention practices, further underscoring that his continued detention at that time was not justified.

53. Following his release, Petitioner fully complied with all conditions of supervision, including attending required check-ins and participating in his immigration proceedings.

54. Petitioner has no history of absconding, no violations of supervision, and no conduct suggesting noncompliance at any point during his release.

55. Petitioner is now subject to a second period of immigration detention arising from the same underlying case, which must be evaluated as part of a cumulative detention framework.

56. The Due Process Clause requires courts to consider the total duration and context of detention, including prior periods of confinement, in determining whether continued detention has become excessive in relation to its regulatory purpose. See, e.g., *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017).

57. Here, Petitioner's combined detention—over 444 days of prior confinement

PETITION FOR WRIT OF HABEAS CORPUS (28 U.S.C. § 2241), AND DECLARATORY AND INJUNCTIVE RELIEF

followed by his current re-detention—renders his custody increasingly excessive and punitive rather than regulatory.

58.This conclusion is further reinforced by the fact that Petitioner was previously released and demonstrated sustained compliance with all immigration requirements, confirming that detention is not necessary to ensure his appearance or protect the community.

59.Where the government has already tested less restrictive alternatives—and those alternatives have proven successful—continued detention without meaningful justification is arbitrary and unconstitutional.

60.Under these circumstances, continued detention without a constitutionally adequate custody determination—one that meaningfully accounts for Petitioner's prior prolonged detention, prior government-authorized release, and demonstrated compliance—violates the Due Process Clause.

61.Accordingly, the cumulative and repeated nature of Petitioner's detention strongly supports immediate release, or, at minimum, a prompt individualized custody determination with heightened procedural safeguards.

## EXHAUSTION

62.Under 28 U.S.C. § 2241, petitioners are not required to exhaust direct

PETITION FOR WRIT OF HABEAS CORPUS (28 U.S.C. § 2241), AND DECLARATORY AND INJUNCTIVE RELIEF

appeals before seeking habeas relief. *Marquez v. INS*, 346 F.3d 892, 897 (9th Cir. 2003); *Hernandez v. Sessions*, 872 F.3d 976, 988 (9th Cir. 2017).  Moreover, Petitioner has exhausted his administrative remedies to the extent required by law, and his only remedy is by way of the instant Petition. *McKart v. United States*, 395 U.S. 185, 193 (1969) (determining that exhaustion is not necessary in cases where pursuit of further administrative remedies would prove futile and the issues posed are purely questions of law); see, e.g., *Beltran v. Noem*, No. 25cv2650-LL-DEB, 2025 LX 484516, at *11 (S.D. Cal. Nov. 4, 2025) ("[A]ppeals to the BIA would be futile because it will find Petitioners subject to mandatory detention pursuant to Matter of Yajure Hurtado under the very statute that Petitioners are challenging.") (citations omitted); *J-C-R-M v. Wamsley*, No. 3:25-cv-990-SI, 2025 LX 522006, at *23 (D. Or. Dec. 9, 2025) (expressing doubt that the agency will correct its position on § 1225 given its "unequivocal commitment" to the positions taken in Yajure Hurtado); *De Paz v. Noem*, No. 2:25-cv-06649-SVW-JPR, 2025 LX 667848, at *9 (C.D. Cal. Oct. 10, 2025) (same); *Rodriguez v. Bostock*, 779 F. Supp. 3d 1239, 1250-52 (W.D. Wash. 2025) (same).

## REQUIREMENTS OF 28 U.S.C. §§ 2241 and 2243

63. The Court must grant the Petition for Writ of Habeas Corpus or issue an Order to Show Cause ("OSC") to Respondents "forthwith," unless Petitioner is not entitled to relief. 28 U.S.C. § 2243.  If an OSC is issued, the Court must require

11

Respondents to file a return "within three days unless for good cause additional time, not exceeding twenty days, is allowed." *Id.*

## CAUSES OF ACTION

## COUNT I

### Habeas Corpus – Unlawful Detention

(28 U.S.C. § 2241; Fifth Amendment)

64. Petitioner realleges all prior paragraphs.

65. Civil immigration detention must be reasonably related to a legitimate government purpose.

66. Petitioner remains detained despite:

- a pending Motion to Reopen,
- a BIA-issued stay of removal,
- a viable release plan, and
- serious medical concerns.

67. Petitioner's complete lack of criminal history, consistent compliance with immigration requirements, and absence of any history of danger further underscore that continued detention is unnecessary and excessive.

68. ICE has not provided a meaningful individualized custody hearing before a neutral decisionmaker.

69. At any such hearing, the government must bear the burden of proving by

PETITION FOR WRIT OF HABEAS CORPUS (28 U.S.C. § 2241), AND DECLARATORY AND INJUNCTIVE RELIEF

clear and convincing evidence that Petitioner poses a flight risk or a danger to the community in order to justify continued detention. *See* Singh v. Holder, 638 F.3d 1196, 1203–04 (9th Cir. 2011).

70.ICE has detained Petitioner and continues to hold him without providing any neutral bond or custody hearing and without considering Petitioner's substantial community ties, no criminal history, compliance history, or community support.

71.In assessing the constitutionality of Petitioner's detention, the Court must consider not only the present period of confinement, but also Petitioner's prior prolonged detention arising from the same proceedings. Petitioner was previously detained for approximately 444 days before being released by the government, and thereafter fully complied with all conditions of supervision without incident.

72.Petitioner's re-detention—after a lengthy prior period of confinement and demonstrated compliance—renders his continued detention excessive and not reasonably related to any legitimate regulatory purpose. The cumulative nature of Petitioner's detention further distinguishes this case from ordinary detention challenges and warrants heightened constitutional scrutiny.

73.Where, as here, the government has already tested less restrictive

PETITION FOR WRIT OF HABEAS CORPUS (28 U.S.C. § 2241), AND DECLARATORY AND INJUNCTIVE RELIEF

alternatives and those alternatives proved effective, continued detention without a constitutionally adequate custody determination violates due process and is unlawful under 28 U.S.C. § 2241.

74.ICE's detention significantly negatively impacts his ability to meaningfully participate in his own immigration case with adequate access to counsel and records.

75.Continued detention without such process violates due process.

76.Petitioner is entitled to release or a constitutionally adequate custody hearing.

77.Such interference violates the Fifth Amendment and is cognizable under § 2241.

78.Arriving alien status does not eliminate constitutional protections.

79.Petitioner therefore seeks a writ of habeas corpus ordering his Immediate release from immigration custody, or, in the alternative, requiring ICE to provide constitutionally adequate custody review and prohibiting any transfer or custodial action that interferes with his ability to obtain meaningful judicial review.

80.ICE's failure to conduct custody review in accordance with 8 U.S.C. § 1226, renders Petitioner's current detention unlawful. Petitioner is entitled to a constitutionally adequate individualized custody determination under 8 U.S.C. § 1226 and the Due Process Clause of the Fifth Amendment.

14

81. As a result, Petitioner's continued detention violates the Due Process Clause of the Fifth Amendment and is unlawful under 28 U.S.C. § 2241.

## COUNT II

**Violation of Fifth Amendment Due Process— Arbitrary Deprivation of Liberty *(U.5. Const. amend. V)***

82. Petitioner realleges all prior paragraphs.

83. The Due Process Clause protects noncitizens physically present in the United States from arbitrary civil detention and guarantees a meaningful opportunity to be heard. *See* Zadvydas v. Davis, 533 U.S. 678, 690 (2001); Hernandez v. Sessions, 872 F.3d 976, 990 (9th Cir. 2017); *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972); *Tokatly v. Ashtoft*, 37l F.3d 613,622 (9th Cir. 2004).

84. In assessing the lawfulness of continued civil immigration detention, due process requires consideration of individualized factors, including family unity, financial hardship, community ties, compliance with supervision, and the non-punitive nature of immigration custody. ICE's failure to consider these equities renders Petitioner's detention arbitrary, excessive, and constitutionally infirm.

85. Petitioner has a protected liberty interest in freedom from unnecessary and

15

prolonged immigration detention, particularly where, as here, he has demonstrated consistent compliance, family unity, community ties, and the absence of any criminal conviction.

86. Petitioner has a protected liberty interest in freedom from arbitrary indefinite immigration detention. See *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976); *Singh v. Holder*, 638 F.3d 1196, 1203-04 (9th Cir. 2011).

87. ICE failed to provide a neutral, individualized custody determination upon detention.

88. Continued detention without procedural safeguards violates due process.

89. ICE's failure to provide a neutral, individualized custody determination upon detention, and its continued detention without procedural safeguards, constitutes an arbitrary and excessive deprivation of liberty.

90. Due process requires consideration of the totality of circumstances, including prior periods of detention and demonstrated compliance with supervision. Petitioner's cumulative detention—exceeding 444 days prior to his current confinement—combined with his history of full compliance, renders continued detention arbitrary and excessive.

91. Due process prohibits arbitrary civil detention.

92. Petitioner has a protected liberty interest.

93. ICE failed to provide adequate procedural safeguards.

PETITION FOR WRIT OF HABEAS CORPUS (28 U.S.C. § 2241), AND DECLARATORY AND INJUNCTIVE RELIEF

94. Any custody determination must consider:

- medical condition,
- ability to comply with supervision,
- housing and stability,
- alternatives to detention.

95. Continued detention without these safeguards violates due process.

## COUNT III

**All Writs Act – Preservation of Jurisdiction** (28 U.S.C. § 1651)

96. Petitioner realleges all prior paragraphs.

97. The Court may issue orders to preserve jurisdiction.

98. Petitioner was nearly removed while emergency relief was pending.

99. Without intervention, Respondents may take actions that frustrate judicial review.

100. This Court has authority under the All Writs Act to issue all orders necessary to preserve its jurisdiction over this habeas action and prevent custodial actions or transfers that would interfere with Petitioner's access to the Court or counsel.

101. The All Writs Act empowers federal courts to issue all writs necessary or appropriate in aid of their respective jurisdictions.

102. Relief is necessary to preserve this Court's jurisdiction.

PETITION FOR WRIT OF HABEAS CORPUS (28 U.S.C. § 2241), AND DECLARATORY AND

INJUNCTIVE RELIEF

# PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully requests:

1. Jurisdiction under 28 U.S.C. §§ 2241 and 1331;

2. Immediate release from ICE custody, particularly in light of Petitioner's prior prolonged detention and demonstrated compliance with all conditions of supervision; or

3. Alternatively, a prompt individualized custody determination with:

    o   meaningful consideration of alternatives to detention,

    o   evaluation of Petitioner's medical condition,

    o   assessment of ability to comply with supervision,

    o   government bearing the burden of justification;

4. Declaratory relief that detention violates due process;

5. Injunctive relief preventing removal while this petition is pending;

6. An order prohibiting transfer without notice and Court approval;

7. Any other relief deemed just and proper.

# REQUEST FOR REMOTE APPEARANCE

Petitioner respectfully requests that any hearing in this matter be conducted via remote appearance (Zoom or telephonic), as counsel may have limited ability to appear in person on short notice due to pre-existing professional obligations. Petitioner remains available to proceed on an expedited basis.

18

PETITION FOR WRIT OF HABEAS CORPUS (28 U.S.C. § 2241), AND DECLARATORY AND INJUNCTIVE RELIEF

Date: March 25, 2026

Respectfully submitted,

___*ss// Sarah R. Hacobian*_____
Sarah R. Hacobian, Esq.
Attorney for Petitioner

PETITION FOR WRIT OF HABEAS CORPUS (28 U.S.C. § 2241), AND DECLARATORY AND

INJUNCTIVE RELIEF

**Exhibit A — Declaration of Counsel**

PETITION FOR WRIT OF HABEAS CORPUS (28 U.S.C. § 2241), AND DECLARATORY AND

INJUNCTIVE RELIEF

## DECLARATION OF SARAH R. HACOBIAN, ESQ.

I, Sarah R. Hacobian, Esq., declare as follows:

1. I am an attorney licensed to practice law in the State of California and am the principal of SRH Law Group, APC, counsel of record for Petitioner Vladislav Krasnov in this action. I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently testify thereto.

2. This declaration is submitted in support of Petitioner's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 and request for immediate release or, in the alternative, a constitutionally adequate individualized custody determination.

*Background and Detention History*

3. Based on my review of records, communications with Petitioner, his family and his immigration attorney, and documents provided in connection with his immigration proceedings, Petitioner is a native and citizen of Russia who entered the United States on or about August 8, 2023, after presenting himself for inspection through the CBP One appointment process.

4. Petitioner was initially taken into immigration custody on or about August 8, 2023, and remained detained for approximately 444 days.

PETITION FOR WRIT OF HABEAS CORPUS (28 U.S.C. § 2241), AND DECLARATORY AND INJUNCTIVE RELIEF

5. Petitioner was released from immigration detention on or about October 2024.

6. Following his release, Petitioner complied with all conditions of supervision imposed by immigration authorities, including attending required check-ins and remaining engaged in his immigration proceedings.

7. On or about February 11, 2026, Petitioner was re-detained by Immigration and Customs Enforcement ("ICE") during a routine check-in in Los Angeles, California.

8. Petitioner is currently detained at the Adelanto ICE Processing Center – Desert View Annex in Adelanto, California.

*Immigration Proceedings and Stay of Removal*

11. On or about March 1, 2024, an Immigration Judge denied Petitioner's application for asylum and ordered him removed.

12. Petitioner has continued to pursue relief through the immigration courts.

13. On or about February 27, 2026, Petitioner, through immigration counsel, filed a Motion to Reopen before the Board of Immigration Appeals ("BIA").

14. That Motion to Reopen remains pending.

15. On March 9, 2026, the BIA granted an emergency stay of removal.

PETITION FOR WRIT OF HABEAS CORPUS (28 U.S.C. § 2241), AND DECLARATORY AND INJUNCTIVE RELIEF

16. Based on my communications and review of records, at the time the stay issued, Petitioner was at an airport in Louisiana and was in the process of being placed on a plane for removal.

17. Following issuance of the stay, Petitioner was returned to immigration custody rather than removed.

*Lack of Custody Determination*

18. Since his re-detention, Petitioner has not been provided with a constitutionally adequate individualized custody determination before a neutral decisionmaker.

19. To my knowledge, no hearing has been conducted at which the government was required to justify Petitioner's continued detention by clear and convincing evidence or to consider alternatives to detention.

*Medical Condition*

20. Based on my communications with Petitioner and review of available medical documentation, Petitioner suffers from vitiligo, an autoimmune condition.

21. Prior to his detention, Petitioner received treatment for this condition through Pacific Skin Institute.

22. Based on my communications, his condition has worsened in detention and that his treatment has been interrupted.

23

23. In my professional judgment, Petitioner's continued detention under these circumstances is contributing to the deterioration of his medical condition.

*Community Ties and Support*

25. Based on my communications with Petitioner and review of supporting documentation, Petitioner has strong community ties.

26. Following his prior release from detention, Petitioner actively volunteered with Russian America for Democracy in Russia ("RADR"), assisting individuals seeking asylum and support.

27. Petitioner also volunteered with the Russian Seattle for Freedom organization, which has expressed its willingness to provide Petitioner with housing, integration support, and community assistance upon release.

28. Letters of support from these organizations and his girlfriend have been obtained and are attached as exhibits.

29. Based on the foregoing, Petitioner has a stable release plan and community support network.

*Compliance and Lack of Risk*

30. Based on my review of records and communications with Petitioner, he has no prior criminal history.

31. Petitioner has no history of failing to appear for immigration proceedings or required check-ins.

24

PETITION FOR WRIT OF HABEAS CORPUS (28 U.S.C. § 2241), AND DECLARATORY AND INJUNCTIVE RELIEF

32. Based on his demonstrated history of compliance, it is my professional assessment that Petitioner does not pose a flight risk or a danger to the community.

*Conclusion*

33. Based on the totality of circumstances—including Petitioner's prior prolonged detention of approximately 444 days, his full compliance following release, his re-detention despite a stay of removal, and his deteriorating medical condition—it is my professional judgment that continued detention is unnecessary and unjustified.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on **March 30, 2026**, at **Glendale, California.**

*Sarah Hacobian*
**Sarah R. Hacobian, Esq.**
Attorney for Petitioner

25

PETITION FOR WRIT OF HABEAS CORPUS (28 U.S.C. § 2241), AND DECLARATORY AND INJUNCTIVE RELIEF

**Exhibit B — Notice to Appear**

26

DEPARTMENT OF HOMELAND SECURITY
## NOTICE TO APPEAR

**In removal proceedings under section 240 of the Immigration and Nationality Act:**

File No: ▇▇▇▇▇▇▇▇▇▇

In the Matter of:

Respondent: _____ **VLADISLAV KRASNOV** _____ currently residing at:

_____ Los Angeles, CA _____

(Number, street, city, state and ZIP code)                    (Area code and phone number)

[x] You are an arriving alien.

[ ] You are an alien present in the United States who has not been admitted or paroled.

[ ] You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;
2. You are a native of Russia and a citizen of RUSSIA;
3. You applied for admission at SAN YSIDRO, CA on 2023-08-08;
4. You did not then possess or present a valid immigrant visa, reentry permit, border crossing identification card, or other valid entry document.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act (Act), as amended, as an immigrant who, at the time of application for admission, is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Act, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality as required under the regulations issued by the Attorney General under section 211(a) of the Act.

[x] This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

[ ] Section 235(b)(1) order was vacated pursuant to:       [ ] 8CFR 208.30    [ ] 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

LOS ANGELES, CALIFORNIA, 606 SOUTH OLIVE ST. 15th FLR, LOS ANGELES, CA, 90014

(Complete Address of Immigration Court, including Room Number, if any)

on ___04/18/2024___ at ___2:00pm___ to show why you should not be removed from the United States based on the

(Date)                    (Time)

charge(s) set forth above. _____         Supervisory Asylum Officer

(Signature and Title of Issuing Officer)

Date: ___8/24/2023___ _____         Houston, TX

(City and State)

DHS Form I-862 (6/22)                                                      Page 1 of 3

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at **www.uscis.gov/i-589**. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at **http://www.ice.gov/contact/ero**, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

### Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: _____

_____
(Signature and Title of Immigration Officer)

_____
(Signature of Respondent)

Date: _____

### Certificate of Service

This Notice To Appear was served on the respondent by me on ___9/11/73___ , in the following manner and in compliance with section 239(a)(1) of the Act.

☐ in person    ☐ by certified mail, returned receipt # _____ requested    ☒ by regular mail

☐ Attached is a credible fear worksheet.

☐ Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the _____ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

_____
(Signature of Respondent if Personally Served)

_____
(Signature and Title of officer)

EOIR - 2 of 5

DHS Form I-862 (6/22)

Page 2 of 3

**Privacy Act Statement**

**Authority:**

The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**

You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**

For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**

Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

EOIR — 3 of 5

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

## NOTICE TO EOIR: ALIEN ADDRESS

Date: 9/11/23

To: Enter Name of BIA or Immigration Court I-830   EOIR Oakdale, LA

Enter BIA or Immigration Court Three Letter Code@usdoj.gov   OAK

From: Enter Name of ICE Office   DHS/ICE/ERO

Enter Street Address of ICE Office   1010 E. Whatley Rd

Enter City, State and Zip Code of ICE Office   Oakdale, LA 71463

Respondent:   Enter Respondent's Name   Krasnov, Vladislav

Alien File No: Enter Respondent's Alien Number   █████

---

This is to notify you that this respondent is:

☐ Currently incarcerated by federal, state or local authorities. A charging document has been served on the respondent and an Immigration Detainer-Notice of Action by the ICE (Form I-247) has been filed with the institution shown below. He/she is incarcerated at:

Enter Name of Institution where Respondent is being detained

Enter Street Address of Institution where Respondent is being detained

Enter City, State and Zip code of Institution where Respondent is being detained

**Enter Respondent's Inmate Number**

His/her anticipated release date is Enter Respondent's Anticipated Release Date.

☒ Detained by ICE on **Enter Date Respondent was Detained by ICE** at:   9/7/23

Enter Name of ICE Detention Facility where Respondent is being detained   Allen Parish Public Safety Complex

Enter Street Address of ICE Detention Facility where Respondent is being detained   7340 HWY 26 W

Enter City, State and Zip Code of ICE Detention Facility where Respondent is being detained   Oberlin, LA 70655

☐ Detained by ICE and transferred on **Enter Date Respondent was transferred to:**

Enter Name of ICE Detention Facility where Respondent has been transferred

Enter Street Address of ICE Detention Facility where Respondent has been transferred

Enter City, State and Zip Code of ICE Detention Facility where Respondent has been transferred

☐ Released from ICE custody on the following condition(s):

  ☐ Order of Supervision or Own Recognizance (Form I-220A)

  ☐ Bond in the amount of Enter Dollar Amount of Respondent's Bond

  ☐ Removed, Deported, or Excluded

  ☐ Other

---

Upon release from ICE custody, the respondent reported his/her address and telephone number would be:

Enter Respondent's Street Address

Enter Respondent's City, State and Zip Code

Enter Respondent's Telephone Number (including area code)

☒ I hereby certify that the respondent was provided an EOIR-33 Form and notified that they must inform the Immigration Court of any further change of address.

ICE Official: Enter Your First, Last Name and Title   Gaven Shelton, DO

ICE Form I-830E (09/09)

| U.S. DEPARTMENT OF HOMELAND SECURITY | NOTICE TO ALIEN |
|---|---|
| **IMMIGRATION AND CUSTOMS ENFORCEMENT** | **NEW COURT LOCATION** |

**DATE:** 9/11/23

**RESPONDENT:** Krasnov, Vladislav                    **FILE NO:** ▮▮▮▮▮▮

**FROM:** U.S.DEPARTMENT OF HOMELAND SECURITY
U.S. IMMIGRATION & CUSTOMS ENFORCEMENT
1010 EAST WHATLEY ROAD OAKDALE, LA 71463

**CC:** U.S.DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
1900 EAST WHATLEY ROAD
OAKDALE, LA 71463

THIS NOTICE IS TO ADVISE YOU THAT THE **NOTICE TO APPEAR, FORM I-862,** ISSUED TO YOU ON 8/24/23 AT Houston, TX HAS BEEN FILED WITH THE OFFICE OF THE IMMIGRATION JUDGE AT EOIR Oakdale, LA . THE MAILING ADDRESS FOR THE OFFICE OF THE IMMIGRATION JUDGE IS: 1900 E. Whatley Rd Oakdale, LA 71463 . YOU SHOULD DIRECT ALL CORRESPONDENCE CONCERNING YOUR CASE TO THIS ADDRESS. YOU ARE REMINDED THAT YOU ARE REQUIRED TO PROVIDE WRITTEN NOTICE WITHIN FIVE (5) DAYS OF ANY CHANGE IN YOUR ADDRESS OR TELEPHONE NUMBER TO THE OFFICE OF THE IMMIGRATION JUDGE LISTED IN THIS NOTICE.

ESTA NOTICIA SIRVE PARA AVISARLE QUE LA ORDEN DE PRESENTAR MOTIVOS JUSTIFICANTES EXPEDIDA A UD 8/24/23 EN Houston, TX HA SIDO REGISTRADA EN LA OFICINA DEL JUEZ DE INMIGRACION EN EOIR Oakdale, LA . LA DIRECCION ES: 1900 E. Whatley Rd Oakdale, LA 71463 . DEBE DIRIGIR TODA CORRESPONDENCIA EN RELACION A SU CASO A ESA OFICINA. SE RECUERDA QUE TIENE LA OBLIGACION DE NOTIFICAR POR ESCRITO EN LA FORMA EOIR-33, EL PLAZO DE CINCO (5) DIAS, CUALQUIER CAMBIO DE DOMICILIO O DE TELEFONO A LA OFICINA DEL JUEZ DE INMIGRACION QUE APARECE EN ESTE AVISO.

**PROOF OF SERVICE**

On 9/11/23 , the undersigned officer mailed or delivered a copy of this Form I-831 to the above-named alien at the address provided on Form I-830 by placing said copy in an envelope and placing said envelope in my office's receptable designated for official "out-going" regular mail, said envelope having been addressed to the name and address indicated.

Name/Title: **Gaven Shelton, SDDO**                    Date: 9/11/13

Signature: *Gaven Shelton*

FORM I-831

**Exhibit C — Notice of Revocation of Release**

27

DEPARTMENT OF HOMELAND SECURITY
## U.S. Immigration and Customs Enforcement

## NOTICE OF REVOCATION OF RELEASE

Alien Name: Krasnov, Vladislav                                        A- File #: ▮▮▮▮▮▮▮▮

Your release on the order of supervision (OSUP) issued to you on or about ____10/24/2024____ is hereby
                                                                        Date OSUP Issued (MM/DD/YYYY)

revoked. You will remain detained in U.S. Immigration and Customs Enforcement (ICE) custody at this time.

☐ Your release has been revoked pursuant to 8 C.F.R. § 241.4(l), for the following reason(s):

   ☐ The purposes of release have been served.

   ☐ You violated a condition of your release. Specifically, you:

   (Information about how condition of release violated)


   ☐ It is appropriate to enforce the removal order entered against you as ICE has the ability and means to effectuate
   your removal.

      ☐ ICE has obtained a travel document and scheduled your removal to take place no later than:

      _____
      Date (MM/DD/YYYY)

      ☐ ICE is seeking a travel document to effect your expeditious removal to _____
                                                 Country of Removal

      ☐ On _____ , you were ordered removed to _____ , but you
        Date (MM/DD/YYYY)                              Country

      were granted withholding of removal to _____ . Your case is under review
                                       Country

      for removal to an alternate country.

☐ Your conduct, or other circumstance, indicates that release is no longer appropriate. Specifically, you:

   (Information about why release no longer appropriate)


**OR**

☒ Your release has been revoked pursuant to 8 C.F.R. § 241.13(i), for the following reason(s):

   ☐ You violated a condition of your release. Specifically, you:

   (Information about how condition of release violated)


☒ Circumstances have changed such that there is a significant likelihood of removal in the reasonably foreseeable
future.

   ☐ ICE has obtained a travel document and scheduled your removal to take place no later than:
      02/20/2026
      Date (MM/DD/YYYY)

☐ ICE is seeking a travel document to effect your expeditious removal to _____ MOLDOVA _____

Country of Removal

☒ On ____03/01/2024____, you were ordered removed to _____ RUSSIA _____, but you

Date (MM/DD/YYYY)                                                                                                                                    Country

were granted withholding of removal to _____. Your case is under review

Country

for removal to an alternate country.

## Notice of Informal Interview

On ____02/12/2026____, you will be afforded an informal interview at which you will be given an opportunity to

Date (MM/DD/YYYY)

respond to the reasons for this revocation. You may submit any evidence or information you wish to be reviewed in support of your release.

## Penalties for Failure to Comply with Order of Removal

You are advised that you must demonstrate that you are making reasonable efforts to comply with the order of removal and that you are cooperating with ICE's efforts to remove you by taking whatever actions ICE requests to affect your removal. You are also advised that any willful failure or refusal on your part to make timely application in good faith for travel or other documents necessary for your departure, or any conspiracy or actions to prevent your removal or obstruct the issuance of a travel document, may subject you to criminal prosecution under 8 U.S.C. § 1253(a) and civil penalties under 8 U.S.C. § 1324d.

_____         02/12/2026
Signature of Authorized Official                 Date (MM/DD/YYYY)

_____
Name of Authorized Official

_____
Title of Authorized Official

**(Note: 8 C.F.R. § 241.4 revocation must be EAD or FOD where there is a public interest to do so and referral to EAD not reasonable; 241.13 may be by RMD)**

| PROOF OF SERVICE |
|---|

**(1)  Personal Service**

(a) I _____, _____,

Name of ICE Officer                                          Title

certify that I served _____ with a copy of this document at

Name of detainee

_____ on _____, at _____.

Institution                                    Date (MM/DD/YYYY)            Time

_____         _____
Detainee Signature                               Date (MM/DD/YYYY)

☐ cc: Attorney of Record or Designated Representative

☐ cc: A-File

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement



## ALIEN INFORMAL INTERVIEW
### UPON REVOCATION OF ORDER OF SUPERVISION UNDER
### 8 C.F.R. § 241.4(I); 8 C.F.R. § 241.13(i)

STATEMENT OF:  Krasnov, Vladislav                          A-File #: ▓▓▓▓▓▓▓▓
                (Detainee)

Detention Location: ADELANTO

INTERVIEWING ICE OFFICER: _____
                            (Print Name, Title & Duty Station)

On ___02/12/2026___ , I conducted an initial informal interview of the detainee listed above in order to afford the alien an opportunity to respond to the reasons for revocation of his or her order of supervision stated in the notification letter. At the interview, the alien made the following oral response regarding the reasons for revocation:

The detainee ☐ did ☐ did not  provide a written statement.

The detainee ☐ did ☐ did not  provide any documents. Any documents provided are attached.

_____
Signature of Interviewing Officer

**FOR INTERNAL USE ONLY**

**Exhibit D — Motion to Reopen**

PETITION FOR WRIT OF HABEAS CORPUS (28 U.S.C. § 2241), AND DECLARATORY AND

INJUNCTIVE RELIEF

Wallie Mason (OV489057)
Mason Immigration Law Office
9854 National Blvd #288
Los Angeles, CA, 90034
Telephone: (323) 297-8440
 wmason@masonimmigration.com

**DETAINED**

## UNITED STATES DEPARTMENT OF JUSTICE

## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

## BOARD OF IMMIGRATION APPEALS

### Falls Church, Virginia

In the Matter of:

Vladislav Krasnov                                    A# ████████

# RESPONDENT'S STATUTORY MOTION TO REOPEN
# BASED ON CHANGED CONDITIONS
# AND INEFFECTIVE ASSISTANCE OF COUNSEL
### (INA § 240(c)(7); 8 C.F.R. § 1003.2)

# TABLE OF AUTHORITIES

## Board of Immigration Appeals cases

*Matter of Lozada*, 19 I&N Dec. 637 (BIA 1988)................................................................1

*Matter of S-Y-G-*, 24 I&N Dec. 247 (BIA 2007)...........................................................2,3

## Federal Statutes

INA § 240(c)(7)(C)(ii)..................................................................................................1, 3

EOIR 2 of 149

# TABLE OF CONTENTS

I.   INTRODUCTION

II.  PROCEDURAL HISTORY

III. LEGAL STANDARD

     A. Statutory Framework

     B. Matter of S-Y-G- Framework

IV. COMPARATIVE COUNTRY-CONDITIONS ANALYSIS

     A. Conditions as of March 1, 2024 (Date of Merits Hearing)

     B. Post-Hearing Escalation: Terrorist Designation of ACF

     C. ECtHR Judgment Naming Mr. Krasnov

     D. Post-Hearing Publicity

     E. Escalation of Repression of Returned Dissidents

V. MATERIALITY UNDER MATTER OF S-Y-G-

VI. PRIMA FACIE ELIGIBILITY

VII. CONVENTION AGAINST TORTURE

VIII. EXEMPTION FROM TIME AND NUMBER LIMITS

IX. CONCLUSION

# INDEX OF EXHIBITS

A.  Decision of European Court of Human Rights 11/30/2023..................................1-16

B.  The Globe and Mail, *Russian dissidents in U.S. warn of deportation unless Canada intervenes 09/16/2025*..................................17-21

C.  Most News, *Russian Anti-War Activist Vladislav Krasnov Arrested in the US During Routine ICE Visit  02/12/2026*..................................22-30

D.  The Guardian, *I escaped one gulag only to end up in another: Russian asylum seekers face Ice detention in the US 03/17/2025*..................................31-39

E.  Novaya Gazeta Europe, *There is no will in sight The story of Leonid Melehin, deported from the United States and immediately arrested in Russia, and other political emigrants seeking salvation in the free world 08/01/2025*..................................40-63

F.  Slavicsac, *444 days in American  immigration detention 12/04/2024*..................................64-66

G.  Most News, *Open letter to President Donald J. Trump,  Members of Congress, and the American People 31/07/2025*..................................67-80

H.  Confirmation of Respendent's volunteering in ACF (Anti-Corruption Foundation) *08/07/2025*..................................81

I.  Affidavit by Ilya Yashin *07/30/2025* and Copy of ID of Ilya Yashin..................................82-85

J.  The New York Times, Russia Labels Navalny's Anti-Corruption Group as Terrorist Organization *11/27/2025*..................................86-87

K.  Amnesty International, Russia: Supreme Court's ominous "terrorist" designation of Navalny's Foundation threatens sweeping reprisals *11/28/2025*..................................88-89

L.  The Criminal Code of the Russian Federation, Article 205.5. Organisation of Activities of a Terrorist Organisation and Participation in Them..................................90-92

M. Decision of the Immigration Judge 03/01/2024..................................93-112

N. Decision of the Board of Immigration Appeals 06/26/2024..................................113-117

EOIR 4 of 149

## I. INTRODUCTION

Vladislav Krasnov respectfully MOVES the Board to reopen his removal proceedings pursuant to INA § 240(c)(7)(C)(ii) based on materially changed country conditions in the Russian Federation and newly discovered evidence unavailable at the time of his March 1, 2024 merits hearing before an Immigration Judge (IJ).

He further moves to reopen based on ineffective assistance of prior counsel under *Matter of Lozada*, 19 I&N Dec. 637 (BIA 1988).[1]

**A.** Since the Immigration Judge's denial:

1. The **European Court of Human Rights (ECtHR)** issued a published judgment in *Abakumov and Others v. Russia*, 30 November 2023, specifically naming the respondent, Vladislav Alekseyevich Krasnov, as a plaintiff and victim of unlawful repression, and ordering the Russian government to pay compensation to Mr. Krasnov (Exh A). At the time of Mr. Krasnov's 3/1/2024 hearing he was unaware that the judgment had been entered. At that time he was detained by DHS in Louisiana and was unable to meaningfully assist in preparation of his case. He was represented by incompetent counsel who did not discover that the European Court had entered a judgment on behalf of Mr. Krasnov.

2. Respondent has been prominently featured in international media identifying him as an anti-war and anti-Putin dissident, including an article dated February 12, 2026 by MOST

---

[1] Respondent was the victim of Ineffective Assistance by all three attorneys who represented him in the case below. He is filing complaints and following the procedures required by *Matter of Lozada* to raise this claim. However, undersigned counsel was recently retained on 2/6/2026 and the procedures for complying with Lozada have not yet been completed. Due to the movant's current detention and impending removal to Russia, this motion is being filed while those procedures are underway. This Motion to Reopen is based primarily on Changed Conditions and requests the Board's adjudication and issuance of a Stay of Removal on that basis. Complaints against prior counsel Vlada Samatova (counsel before the IJ), Olga Efimova (counsel before the BIA), and Nataliya Gavlin (counsel before the Fifth Circuit Court of Appeals) and evidence of their ineffective assistance of counsel will be forthcoming.

1

Media & News titled "Russian Anti-War Activist Vladislav Krasnov Arrested in the U.S. During Routine ICE Visit," which discusses his detention and the heightened risk he faces if deported to Russia. (Exh. C.) **MOST Media & News ("MOST Media")** is an independent, paywall-free digital news and commentary outlet that identifies its editorial team and contributors on its site, including named leadership. The outlet also discloses organizational details such as a **U.S. EIN** and mailing address, reflecting transparency about its operations and publication structure.

3. Russian authorities escalated repression by formally designating Aleksei Navalny's Anti-Corruption Foundation (ACF/FBK), with which Respondent volunteered, as a terrorist organization on 11/27/2025 (Exh. J-K). This change dramatically increases criminal exposure for anyone associated with the group.

4. Credible reports confirm that Russian asylum seekers deported by the United States in 2025 were detained and searched upon arrival in Moscow and in some cases arrested and or/forcibly conscripted. (Exh. E)

These developments fundamentally alter Respondent's individualized risk profile and satisfy the comparative framework of *Matter of S-Y-G-*, 24 I&N Dec. 247 (BIA 2007).

**B**. The Respondent respectfully requests reopening on the basis of ineffective assistance of former counsel consistent with the requirements set forth in *Matter of Lozada*, 19 I&N Dec. 637 (BIA 1988).

1. Respondent' first Prior counsel, Vlada Samatova, who represented the respondent before the IJ, failed to investigate and present the ECtHR judgment, failed to properly develop corroborating evidence, and failed to rehabilitate the IJ's adverse credibility findings

through medical and neurological evidence that the respondent suffers from an autoimmune disease which causes physical behaviors that can be mistaken for evasiveness.

2. Respondent' second Prior counsel, Olga Efimova, who represented the respondent in his BIA appeal failed to properly raise the ineffective assistance of counsel issue, and she was herself suspended by this Board while the appeal was pending.

3. Respondent's third Prior counsel, Nataliya Gavlin, who represented him in his petition to the Fifth Circuit Court of Appeals, failed to raise the ineffective assistance of the prior two attorneys The Respondent is seeking Reopening and Remand of his application for Asylum and related relief.

## CHANGED CIRCUMSTANCES AND NEWLY OBTAINED EVIDENCE REQUIRING REOPENING:

Under **Matter of S-Y-G-**, 24 I&N Dec. at 253, the Board must, in essence, compare country conditions at the time of the original hearing with current conditions and determine whether the change is material and previously unavailable. The individual hearing in this case took place on 3/1/2024. The respondent MOVES this board this 17th day of February, 2026 to Reopen his Case based on changed circumstances, new evidence and newly discovered evidence not presented at the time of the merits hearing.

The comparative analysis demonstrates that Mr. Krasnov's protest activities in support of Alexei Navalny in Russia were previously illegal but subject primarily to administrative detention and fines. Due to changes in the law and the 11/27/2025 designation of Alexci Navalny's anti-corruption foundation as a Terrorist group, Mr. Krasnov now faces possible

3

prosecution under terrorism statutes, specifically under Article 205.5 of the Criminal Code of the Russian Federation (organization of or participation in the activities of a terrorist or extremist organization), which carry penalties of up to life imprisonment for organizing activities and lengthy custodial sentences for participation (Exh. L).

## II. PROCEDURAL HISTORY

Mr. Krasnov is a Russian political activist who participated in anti-corruption and anti-war demonstrations aligned with Aleksei Navalny's movement. He was detained and surveilled in Russia.  On March 1, 2024, the Immigration Judge denied asylum and related relief .

The record at that time did not include:

• The ECtHR judgment naming Mr. Krasnov as a complainant, finding the Russian government guilty of violating his rights, and ordering the payment of compensation to him;
• Post-hearing international media coverage including Mr. Krasnov's photo and anti-Putin quotes;
• Evidence of targeting of deported activists by Russia under extremism/terrorism statutes;
• Russia's designation of Navalny's Anti-Corruption foundation as a terrorist organization.

## III. LEGAL STANDARD

### A. Statutory Framework

Under INA § 240(c)(7)(C)(ii), a Motion to Reopen may be filed at any time if based on changed country conditions arising in the country of nationality, supported by material evidence that was not available and could not have been discovered or presented at the previous hearing.

**B. Matter of S-Y-G- Framework**

In **Matter of S-Y-G-**, 24 I&N Dec. at 253 the Board held that adjudication requires:

1. A comparison of country conditions at the time of the original hearing with conditions at the time of the motion;

2. A determination whether the change is material;

3. An assessment whether the new evidence establishes prima facie eligibility.

**IV. COMPARATIVE COUNTRY-CONDITIONS ANALYSIS**

**A. Conditions as of March 1, 2024 (Date of Merits Hearing)**

As of Respondent's merits hearing on **March 1, 2024**, repression in the Russian Federation was severe but operated within the legal framework of extremism and protest-related statutes—not terrorism law.

Penalties included administrative detention, fines, and determinate custodial sentences. These provisions did not place individuals within the terrorism framework of Articles 205 et seq. of the Russian Criminal Code and did not carry potential life imprisonment, terrorism-based investigative presumptions, or high-security detention regimes.

Accordingly, at the time of the hearing in March 2024, Respondent's risk profile was evaluated as that of a protest participant and ACF volunteer subject to extremism-related liability. Evidence and testimony was presented that he was a supporter and volunteer of Navalny's ACF organization. But at that time there was no consideration that Mr. Krasnov would be categorized as supporting a terrorist organization and be subject to prosecution under anti-terrorism laws in

Russia. Now, with the November 2025 changes in laws, he now faces much more serious prosecution in Russia than in 2024.

**B. Post-Hearing Escalation: Terrorist Designation of ACF**

After the March 1, 2024 hearing, the legal classification governing Navalny's ACF fundamentally changed.  On June 9, 2021, the Moscow City Court designated the Anti-Corruption Foundation (ACF) as an "extremist organization." As of March 1, 2024, ACF had not been designated a terrorist organization. Supporters and volunteers were prosecuted under extremism statutes, public assembly laws, and (after March 2022 amendments) under "discrediting the armed forces" provisions. (Exh. J-K)

On **October 22, 2025**, the Prosecutor General petitioned the Supreme Court of the Russian Federation to designate ACF as a "terrorist organization." On **27th of November 2025**, the Supreme Court granted that petition and formally added ACF to the federal list of terrorist organizations. This reclassification moves ACF and its supporters from the extremism framework into the terrorism provisions of the Russian Criminal Code.

Terrorist designation carries:

- Prosecution under Russian Terrorism law, Articles 205 et seq.;

- Potential life imprisonment;

- Expanded surveillance and investigative authority;

- Presumptive prolonged pretrial detention;

- Placement in high-security detention facilities;

- Elevated prosecutorial priority and stigma.

EOIR 10 of 149

6

This shift materially increases both the severity of punishment and the likelihood of prosecution for individuals, like Mr. Krasnov, previously associated with ACF.

**Material Difference**

The reclassification of ACF from an "extremist" organization to a "terrorist" organization is a categorical legal escalation. It moves Respondent's prior volunteer activity from a regime involving fines, administrative detention, and determinate sentences into the terrorism framework of Articles 205 et seq., where prosecution carries potential life imprisonment, expanded surveillance authority, presumptive prolonged pretrial detention, harsher conditions of confinement, and elevated prosecutorial priority. Under the Matter *of S-Y-G-*, this transformation is material because it fundamentally increases both the severity of punishment and the probability that the Respondent will be prosecuted upon return.

**C. ECtHR Judgment Naming Mr. Krasnov**

On November 30, 2023, the European Court of Human Rights issued its judgment in *Abakumov and Others v. Russia*, expressly naming Vladislav Alekseyevich Krasnov (Application No. 40293/19) as an applicant and finding violations of Article 11 of the Convention arising from disproportionate measures taken against him in connection with public assembly activity (Exh. A).

Although the judgment was adopted prior to the March 1, 2024 merits hearing, it was not presented in the immigration proceedings. Respondent was detained and unaware that the decision had been issued. Before his detention in the US, Mr. Krasnov had consulted with attorneys and had filed the Complaint of Human Rights violations against Russia in the European

Court. While in US detention his communication with his lawyers abroad was cut off. He did not receive notice that the important judgment of the Court had taken place. Nor did his attorney before EOIR, Vlada Samatova, discover its existence.  It therefore was not part of the evidentiary record before the Immigration Judge.

The comparative significance is substantial:

**Before the hearing:** Respondent was a local protest participant subject to administrative penalties.

**After the ECtHR judgment:** He is a named litigant in an international judicial decision formally condemning the Russian Federation's unlawful repression against him.

This transforms Respondent from an ordinary protest participant into an internationally documented dissident whose mistreatment has been recognized by an international court. Such judicial recognition materially increases his visibility, political salience, and the likelihood that Russian authorities are aware of his identity and prior opposition activity.

### D. Post-Hearing Publicity

Since the March 1, 2024 merits hearing, Respondent has been publicly identified in major international media as an anti-war activist and former political detainee. In **March 2025**, *The Guardian* published an article naming Vladislav Krasnov and describing his 444-day immigration detention following his flight from Russia. (Exh. D)  In **September 2025**, *The Globe and Mail, a Canadian* publication with international online circulation, reported on Russian dissidents in U.S. custody facing potential deportation. The article features photos of Mr. Krasnov and quotes from him, denouncing Putin and the Russian government for its human

rights abuses. (Exh. D)  Prominent opposition figure Ilya Yashin also submitted a sworn affidavit identifying Mr. Krasnov is a known activist and protest organizer who opposed the Russian regime (Exh. I)

At the time of the merits hearing, Respondent's public profile was limited and not as largely known. He was not the subject of searchable international media coverage linking him to anti-war activism, Navalny's movement, or U.S. immigration detention.

That is no longer the case. A simple search of Respondent's name now produces aggregated summaries (including through widely used Google AI mode) identifying him as a Russian activist and protest organizer who fled Russia due to political repression. His identity and political stance are now readily discoverable through publicly accessible international reporting. A simple google search of Mr. Krasnov's name returns numerous sources describing him as an anti-Putin, anti-war activist.

In a country where authorities actively monitor opposition figures, track dissident activity abroad, and prosecute speech made outside the Russian Federation, this level of digital visibility materially increases the likelihood of targeting. Under *Matter of S-Y-G-*, the post-hearing expansion of Respondent's searchable international profile constitutes a material change in his individualized risk assessment.

**E. Escalation of Repression of Returned Dissidents**

Recent reporting and documented cases confirm that deported Russian opposition activists face immediate detention and criminal prosecution upon return. Novaya Gazeta Europe reports that deportees are routinely interrogated by the FSB, Russian security police, upon their return to

9

Russia  and may be charged under extremism or terrorism-related provisions, including Articles 205.2 and 282.1 of the Criminal Code. The outlet further documents cases in **2025** in which activists deported from the United States were arrested shortly after arrival and charged with "justification of terrorism" or "discrediting the armed forces," exposing them to multi-year prison terms. (Exh. E)

Additionally, reliable sources report that  Russian authorities have expanded trials in absentia and enforcement mechanisms targeting émigrés, signaling an intensified posture toward opposition figures abroad. Human rights reporting further confirms the risk of harsh detention conditions, denial of medical care, and politically motivated prosecutions against Navalny supporters (Exh. E).

These developments demonstrate that return now carries a substantially heightened enforcement risk compared to March 1, 2024. When combined with:

- Respondent's formal identification in an ECtHR judgment;
- His searchable international publicity as an anti-war dissident;
- The post-hearing terrorist designation of ACF;

The result is not merely continued repression, but a qualitatively different and materially escalated risk profile. Under the Matter *of S-Y-G-*, the cumulative effect of these changes significantly increases both the probability and severity of persecution upon return.

### V. MATERIALITY UNDER MATTER OF S-Y-G-

Under S-Y-G-, the change must be material, not incremental.

10

Here, in Mr. Krasnov's case:

• The legal classification of Navalny's anti-corruption organization with which Mr. Krasnov volunteered has escalated from extremist to terrorist .

• The penalties have escalated from detention to potential life imprisonment.

• International judicial identification as a victim-plaintiff of Russian abuse  increases state awareness of Mr. Krasnov.

These factors demonstrate a structural escalation of legal consequences for Mr. Krasnov should he be removed to Russia - not merely continued repression.

## VI. PRIMA FACIE ELIGIBILITY

To establish prima facie eligibility, the respondent must show a reasonable likelihood of success.

The cumulative record now establishes:

1. Past political protest and detention;

2. International judicial confirmation of repression;

3. Public anti-war speech;

4. Association with an organization facing terrorist designation ;

5. Escalating prosecutions of dissidents.

The evidence demonstrates a reasonable likelihood that Mr. Krasnov would face persecution on account of political opinion.

## VII. CONVENTION AGAINST TORTURE

Terrorism prosecutions in Russia are frequently accompanied by:

• Prolonged pretrial detention;

• Penal colony confinement;

• Documented abuse of political detainees.

Given his public identification and ACF affiliation, the probability of severe custodial mistreatment rises to the level required under CAT.

## VIII. EXEMPTION FROM TIME AND NUMBER LIMITS

This motion is based on post-hearing changed country conditions, including:

• The ECtHR judgment naming Mr. Krasnov;

• Public exposure of the Movant as a Russian dissident in international media;

• The designation of the ACF organization as a Terrorist group subject to severe penalites .

It is therefore exempt from statutory time and number limits.

## IX. CONCLUSION

Under the comparative framework required by **Matter of S-Y-G-**, the record demonstrates a material escalation in country conditions since March 1, 2024 .

These changes in Russia have occurred since the Movant's hearing of 3/1/2024 and materially increase the likelihood of his persecution and torture should he be removed to that country.

Respondent respectfully requests that the Board:

1. Grant a Stay of Removal during review of this Motion to Reopen;

2. Grant the Motion to Reopen and Remand this matter for further proceedings before an

   Immigration Judge;

3. Grant such further relief as deemed appropriate.

Respectfully submitted,

s/ Wallie Mason

Wallie Mason Esq.
 Mason Immigration Law Office
9854 National Blvd #288 Los Angeles, CA, 90034
Telephone: (323) 297-8440
wmason@masonimmigration.com

EOIR 17 of 149

# CERTIFICATE OF SERVICE


I hereby certify that on February 17, 2026, a true and correct copy of
RESPONDENT'S STATUTORY MOTION TO REOPEN BASED ON
CHANGED CONDITIONS AND INEFFECTIVE ASSISTANCE OF COUNSEL
(INA § 240(c)(7); 8 C.F.R. § 1003.2)  was electronically served via the EOIR
Courts & Appeals System (ECAS) upon the Office of the Principal Legal Advisor
(OPLA), New Orleans, 423 Canal Street, Suite 450, New Orleans, LA 70130,  and
separately upon the Office of the Principal Legal Advisor (OPLA), Los Angeles
(Adelanto), 10250 Rancho Road, Adelanto, CA 92301, in accordance with
applicable EOIR procedures.


_Wallie Mason_

Wallie Mason, Esq.
Mason Immigration Law Office
9854 National Blvd #288
Los Angeles, CA 90034
(323) 297-8440
wmason@masonimmigration.com
Counsel for Respondent/Movant

**Exhibit E — Supplemental Brief In Support of Motion to Reopen**

PETITION FOR WRIT OF HABEAS CORPUS (28 U.S.C. § 2241), AND DECLARATORY AND

INJUNCTIVE RELIEF

**Wallie Mason (OV489057)**                                      **DETAINED**

**Mason Immigration Law Office**

**9854 National Blvd #288**

**Los Angeles, CA, 90034**

**Telephone: (323) 297-8440**

**wmason@masonimmigration.com**

## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## BOARD OF IMMIGRATION APPEALS
### Falls Church, Virginia

**In the Matter of:**

**Vladislav Krasnov**                                           A#▮▮▮▮▮▮▮

## SUPPLEMENTAL BRIEF IN SUPPORT OF
## RESPONDENT'S MOTION TO REOPEN
### (under INA § 240(c)(7)(C)(ii);INA § 240(c)(7))

Filed at BIA on 03/08/2026 at 12:56:08 AM (Eastern Standard Time)
Case 5:26-cv-01532-VBF-JDE   Document 1   Filed 03/30/26   Page 57 of 137   Page ID
#:57

## TABLE OF AUTHORITIES

### Board of Immigration Appeals Cases

*Matter of S-Y-G-*, 24 I&N Dec. 247 (BIA 2007)..................................................4,5

*Matter of Cerna*, 20 I&N Dec. 399, 403 (BIA 1991)...............................................2

*Matter of Lozada*, 19 I&N Dec. 637 (BIA 1988)..........................................6,7,8,12

*Matter of Tomas*, 19 I&N Dec. 464 (BIA 1987).....................................................11

*Matter of O-Z- & I-Z-*, 22 I&N Dec. 23 (BIA 1998)..............................................10

### Federal Courts of Appeals Cases

*Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1287 (11th Cir. 2005)...........................14

*Zhi v. Holder*, 751 F.3d 1088, 1097 (9th Cir. 2014)................................................15

### Federal Statutes

8 U.S.C. § 1158(b)(1)(B)(iii).................................................................................13

EOIR 2 of 47

# TABLE OF CONTENT

**I. Procedural Background**.................................................................................................**1**

**II. The ECtHR Judgment Materially Undermines the Immigration Judge's "Not Known to Government" Finding**...............................................................................................**2**

    A. Formal State Notice: Russia is aware that the Respondent filed a complaint with the European Court of Human Rights, with regard to his 2018 arrest in Moscow for protesting…**3**

    B. Transformation of Respondent's Political Profile..............................................**3**

    C. Documented Retaliation Against ECtHR Applicants Demonstrates Increased Risk………**4**

**III. Terrorist Designation of Navalny's Anti-Corruption Foundation and Escalation of Risk**………………………………………………………………………………….**5**

**IV. Prior Proceedings Were Compromised by Serious Procedural Deficiencies**……………**6**

    A. Failure to Preserve and Properly Articulate a Viable Protected Ground…………………**8**

    B. Disorganized Direct Examination and Resulting Record Fragmentation………………...**9**

    C. Inadequate Rehabilitation of the "No Physical Harm" Testimony……………………….**10**

    D. Interpretation Breakdowns and Failure to Preserve Objection…………………………..**10**

    E. Failure to Identify and Submit Critical Corroborating Evidence………………………..**11**

**V. Respondent's Challenge to the Adverse Credibility Finding**…………………………**12**

    A. Failure to Consider Medical Evidence in Assessing Demeanor-Based Credibility.……**12**

    B. The Immigration Judge's Adverse Credibility Determination Is Not Supported by Substantial Evidence……………………………………………………………….…..**13**

    C. The Record Contains Independent Objective Evidence Confirming the Central Events of the Claim…………………………………………………………….……**14**

    D. The Alleged Inconsistency Relating to the Visa Application Constitutes, at Most, a Framing or Materiality Issue Rather Than Evidence of Fabrication……………..…..**15**

    E. The Immigration Judge Improperly Relied on Demeanor Findings Derived From a Remote Video Hearing Without Adequately Accounting for Respondent's Medical Condition...**17**

Filed at BIA on 03/08/2026 at 12:59:88 AM (Eastern Standard Time)
Case 5:26-cv-01532-VBF-JDE    Document 1    Filed 03/30/26    Page 59 of 137   Page ID
#:59

F. The Totality of the Circumstances Supports Credibility…………………………………**18**

G. The Adverse Credibility Finding Requires Reversal or Remand……………………..**18**

**VI.** Impact of the ECtHR Judgment……………………………………………………………**19**

**VII.** Prima Facie Eligibility on the Current Record…………………………………………**20**

**VIII.** Conclusion and Requested Relief…………………………………………………….…**21**

EOIR 4 of 47

# INDEX OF MTR EXHIBITS

**O.** Letter from Oleg Elanchik, Counsel to Mr. Krasnov before the European Court of Human Rights,  dated 02/26/26 explaining the respondent was unaware of the European Court's decision in his favor, at the time of his 3/1/2024 hearing..........................................................................**1-3**

**P.** Pacific Skin Institute Dermatology Progress Notes and Medication List for Vladislav Krasnov, 03/04/2025, indicating a diagnosis of Auto-immune disease, vitiligo......................................**4-5**

**Q.** Nigro A, Osman A, Suryadevara P, Cices A. Vitiligo and the microbiome of the gut and skin: a systematic review. Arch Dermatol Res. 2025 Jan 8;317(1):201. Doi: 10.1007/s00403-024-03679-6. PMID: 39777551.............................................................................**6**

**R.** Extracts from hearing transcript of  3/1/ 2024....................................................................**7-13**

**S.** Russia breached rights in Chechnya — European court, Reuters (Aug. 9, 2007)..........................**14-15**

Filed at BIA on 03/08/2026 at 12:58:08 AM (Eastern Standard Time)
Case 5:26-cv-01532-VBF-JDE    Document 1    Filed 03/30/26    Page 61 of 137   Page ID
#:61

# SUPPLEMENTAL BRIEF IN SUPPORT
# OF RESPONDENT'S MOTION TO REOPEN

### I. Procedural Background

Respondent Vladislav Krasnov, a citizen of the Russian Federation, arrived at the US border on 8/8/2023. He was detained by the Department of Homeland Security in Oakdale, Louisiana and issued a Notice to Appear.  On 11/29/2023 the respondent applied for Asylum, Withholding of Removal, and protection under the Convention Against Torture.   An individual hearing was held before Immigration Judge Cassie Thogersen on 3/1/2024. The claim was presented on political opinion grounds as the respondent is a long-time anti-Putin activist.

At the conclusion of the Individual hearing, the Immigration Judge denied all relief. See Oral Decision of the Immigration Judge.  The denial rested substantially on findings that Respondent was not a prominent or targeted activist, was not known to Russian authorities, had not suffered significant harm, and faced only speculative future risk (BIA MTR Ex.M:16-19). The Immigration Judge found Respondent not credible and further held that, even assuming credibility, Respondent failed to demonstrate individualized risk (BIA MTR Ex.M:16-17). The adverse credibility determination was influenced by the respondent's failure to list his 2018 arrest for protesting in Moscow on a Non-immigrant student visa application filed in 2022 (BIA MTR Exh. R: 95) Central to the denial was the Immigration Judge's express conclusion: "It is clear that the respondent is not known by the Russian government or a concern to the Russian government as a social activist" (BIA MTR Ex.M:18).

1

This Motion to Reopen is supported by changed conditions and new material evidence—most critically the November 30, 2023 judgment of the European Court of Human Rights ("ECtHR"), BIA MTR Ex. A—as well as by significant procedural deficiencies that undermined the integrity of the prior proceedings.

## II. The ECtHR Judgment Materially Undermines the Immigration Judge's "Not Known to Government" Finding

Mr. Krasnov is asking this Board to reopen proceedings so that he may present new and previously unavailable evidence. *Matter of Cerna*, 20 I&N Dec. 399, 403 (BIA 1991). The Immigration Judge's decision denying his asylum application was heavily premised on the conclusion that Respondent was not known to Russian authorities (BIA MTR Ex.M:18-19.) This Motion to Reopen is based on changed conditions and newly discovered evidence, specifically the November 30, 2023 ECtHR judgment. BIA MTR Ex. A. That European court judgment, as well as the extensive media attention which the respondent has garnered, fundamentally alters the factual landscape. The new evidence dramatically raises his visibility as an anti-Kremlin protester and puts him at a high risk of persecution should he be returned to Russia. This key evidence was not known to Mr. Krasnov at the time of his asylum hearing. He was detained in Louisiana, not in touch with his European attorney who brought the case at the ECtHR, and the respondent's immigration counsel in the US failed to discover that the important judgment of the European Court had been rendered. See MTR Ex. O, (Letter from Oleg Elanchik, Counsel to Mr. Krasnov before the European Court of Human Rights, dated 02/26/26 explaining the respondent was unaware of the European Court's decision in his favor, at the time of his 3/1/2024 hearing.)

2

**A. Formal State Notice: Russia is aware that the Respondent filed a complaint with the European Court of Human Rights, with regard to his 2018 arrest in Moscow for protesting**

In *Abakumov and Others v. Russia*, (MTR Ex. A) the European Court of Human Rights expressly named Vladislav Alekseyevich Krasnov as an applicant and found that the Russian Federation violated his Article 11 rights (BIA MTR Ex.A, Chart of Complainants,  Complainant #25,Vladislav Alekseyevich Krasnov ). ECtHR proceedings necessarily involve formal identification of applicants, direct state representation by the Russian Federation, and official publication of judgment.

The Russian government had formal notice of Respondent's identity as a complainant alleging unlawful state repression. This fact is incompatible with the Immigration Judge's finding that Respondent was "not known" to the government. Decision of the IJ.

**B. Transformation of Respondent's Political Profile**

The Immigration Judge,  characterized the respondent as a minor protest participant, and his 2018 detention was treated as isolated and limited (BIA MTR Ex.M:16-19; Oral decision of the Immigration Judge, 3/1/2024). The ECtHR judgment materially transforms that profile. Respondent is a named litigant in an international human rights ruling against the Russian Federation. His identity is publicly documented as a complainant in litigation alleging unlawful suppression of political assembly, and his name is permanently associated with a judicial finding of state misconduct. Not only was he a party in this international court proceedings but he won the case.  The ECtHR ordered the Russian federation to pay compensation to Mr. Krasnov. (BIA MTR Ex. A)

**C. Documented Retaliation Against ECtHR Applicants Demonstrates Increased Risk**

Participation as a named applicant before the European Court of Human Rights places an individual in direct adversarial posture against the state. The Russian Federation receives formal notice of applicants' identities and claims, and published judgments permanently associate applicants with allegations of state misconduct. In the respondent's case the European Court explicitly held that his arrest by the Russian government on 9/10/2018 and fining him for protesting was a violation of Article 5(1) of the European Convention on Human Rights prohibiting Unlawful Detention, and the imposition of the fine was a violation of Article 6(1) in that the Russian court or tribunal which penalized the respondent and imposed the fine was not impartial.  (MTR Ex. A, chart of complainants, page 11.)

There are documented instances of retaliation by the Russian government against  individuals who filed applications with the ECtHR.  In one high profile case, human-rights activist Zura Bitiyeva, filed a complaint with the ECtHR alleging unlawful detention and abuse by Russian authorities.  She  was later killed by Russian agents along with members of her family in an attack widely reported by international observers as retaliation connected to her human-rights advocacy and seeking redress before the European Court of Human Rights. See *Russia breached rights in Chechnya — European court*, Reuters (Aug. 9, 2007) at MTR Ex. S.

The ECtHR judgment naming Respondent publicly identifies him as a litigant against the Russian Federation and materially increases his political visibility and risk profile. Under *Matter of S-Y-G-*, 24 I&N Dec. 247 (BIA 2007), this constitutes material new evidence demonstrating an increased likelihood of future persecution.

4

### III. Terrorist Designation of Navalny's ACF

Since the March 1, 2024 hearing, conditions materially affecting Respondent's risk profile have changed. Navalny's Anti-Corruption Foundation ("ACF") has been designated a terrorist organization under Russian law, extending terrorism statutes to volunteers and supporters and exposing them to severe criminal penalties, including potential life imprisonment, BIA MTR Ex. L.

Respondent testified that he volunteered with Navalny's organization and participated in opposition protests. He also served as an election observer, working on behalf of Navalny's group. TR 44: 3-4. The heads of the Navalny organization, the Anti-Corruption Foundation have submitted sworn affidavits in support of Respondent, further confirming his involvement and publicly associating him with the organization's leadership (MTR BIA Ex.h). In the current legal environment, such documented affiliation carries heightened risk.

When considered together with his identification in an ECtHR judgment, his public anti-war expression, and the documented prosecution of political dissidents, the Respondent's profile has fundamentally changed. He is no longer "merely" a protest participant but a publicly identifiable litigant against the Russian Federation and a documented supporter of an organization now classified as terrorist by the state.

This cumulative escalation materially increases the likelihood of persecution and satisfies the materiality standard articulated in *Matter of S-Y-G-*, 24 I&N Dec. 247 (BIA 2007), thereby establishing prima facie eligibility for reopening.

5

**IV. Prior Proceedings Were Compromised by Serious Procedural Deficiencies**

As stated above, the Respondent respectfully requests reopening on the basis of new evidence. However, the ineffective assistance of former counsel also materially impacted the respondent's presentation of his asylum claim and undersigned counsel is undertaking the proper preliminary steps to satisfy the requirements set forth in *Matter of Lozada*, 19 I&N Dec. 637 (BIA 1988). These steps have not been completed as of the date of the filing of this brief.

1. Respondent' first Prior counsel, Vlada Samatova, who represented the respondent before the IJ, failed to investigate and present the ECtHR judgment, failed to properly develop corroborating evidence, and failed to rehabilitate the IJ's adverse credibility findings through medical and neurological evidence that the respondent suffers from an autoimmune disease which causes physical behaviors that can be mistaken for evasiveness.  Prior counsel indicated in a pre-hearing statement that Mr. Krasnov was also a member of a particular social group.  But counsel then abandoned a proposed particular social group formulation following the Immigration Judge's characterization of it as overly broad (BIA MTR Exh. R: 25). As a member of the Navalny anti-corruption organization a finding that Mr. Krasnov is part of a particular social group could have provided an alternative basis for granting asylum.

2. Respondent' second Prior counsel, Olga Efimova, who represented the respondent in his BIA appeal failed to properly raise the ineffective assistance of counsel issue of prior counsel.   Ms. Efimova was herself suspended from practicing law and appearing in matters before this Board while the appeal was pending.  She had been retained to bring a claim of Ineffective Assistance of Counsel against attorney Samatova, but Ms. Efimova

6

did not effectuate the claim under Fifth Circuit standards for *Matter of Lozada* complaints, and the appeal was denied.

3. Respondent's third Prior counsel, Nataliya Gavlin, who represented him in his petition to the Fifth Circuit Court of Appeals, failed to raise the ineffective assistance of the prior two attorneys. The Respondent is seeking a reversal by the Board of his Asylum denial. In the alternative the respondent seeks Reopening and Remand in order that he may have the opportunity to present material evidence in support of his application for Asylum and related relief.

This Motion to Reopen is firmly supported by changed circumstances and newly discovered evidence. However, independent of that legal basis, reopening is also warranted because the prior proceedings were inadequate and failed to meet due process standards. The Immigration Judge was not in the same room as the respondent. The hearing was conducted by Webex video. At his hearing on 3/1/2024, all of the parties appeared via video from different locations. Respondent's counsel was in another state, and the Presiding Judge conducted the remote hearing. A review of the recording of the hearing reveals technical difficulties, Russian-English interpretation difficulties and general confusion and communication problems.

During the hearing the Immigration Judge made numerous references to the respondent's body language and demeanor. She noted he seemed nervous. In making her adverse credibility determination the Judge noted the respondent's nervous behavior. . In reopened proceedings, the respondent will show that his rights to a fair hearing were materially compromised by ineffective assistance of counsel and fundamental record-development failures. He will present evidence of a medical condition which contributes to his 'nervous fidgeting.'

EOIR 12 of 47

7

**A. Failure to Preserve and Properly Articulate a Viable Protected Ground**

As stated *supra*, former counsel initially articulated a particular social group ("PSG") consisting of "members of the governmental opposition" or "anti-Putin and anti-war individuals." After the Immigration Judge expressed concern regarding breadth and definitional clarity, counsel abandoned the PSG theory altogether rather than refining it into a cognizable and narrower formulation.   TR 25: 13-14

Reasonable alternative formulations were readily available and supported by the record, including:

- "Publicly identified volunteers of Navalny's Anti-Corruption Foundation," or
- "Individuals associated with an organization later designated extremist or terrorist by the Russian government."

Counsel's failure to preserve and refine the protected-ground theory foreclosed a legally viable basis for relief. This omission is particularly prejudicial in light of the subsequent terrorist designation of Navalny-affiliated organizations, which materially strengthens the nexus and future-persecution analysis.

Under *Matter of Lozada*  19 I&N Dec. 637 (BIA 1988) deficient performance is established where counsel's actions fall below prevailing professional norms and prejudice the respondent. Here, abandoning rather than refining the PSG theory deprived Respondent of a structured nexus framework and materially affected the outcome of the proceedings. The prejudice is evident: a properly articulated PSG tied to formal extremist/terrorist designation would have significantly strengthened both credibility and well-founded fear analyses.

8

The respondent proceeded at his hearing to present his asylum claim through testimony based on his fear of persecution on account of his political opinion. His political opinion, which he has expressed in Russia through his past participation in anti-Putin and pro-democracy protests, form a sufficient basis to support a grant of asylum. But he also had an additional basis for asylum, a PSG, which is important to his case.

**B. Disorganized Direct Examination and Resulting Record Fragmentation**

The prior proceedings were further compromised by counsel's failure to present Respondent's testimony through a coherent and structured direct examination. Instead of establishing a clear chronological narrative, substantial foundational questioning was conducted by the Immigration Judge, including inquiries into Respondent's travel history, visa background, military status, and protest participation. Matters that should have been introduced methodically through counsel were instead developed piecemeal during judicial questioning and later clarified under cross-examination.

This lack of organization fragmented the evidentiary record and created the appearance of inconsistency where none existed. Without a structured narrative, key aspects of Respondent's claim—including the relationship between the 2018 arrest and later political activities, discrepancies regarding protest size, Respondent's military exemption due to vitiligo, and the absence of post-arrest summons—were introduced out of sequence and without adequate contextual framing. The resulting record reflects confusion amplified during adversarial questioning rather than contradictions in Respondent's account.

A coherent chronological examination would have clarified these issues at the outset and minimized opportunities for adverse credibility inferences. Counsel's failure to organize and

9

present the testimony in this manner materially prejudiced Respondent by contributing directly to the credibility concerns relied upon by the Immigration Judge.

## C. Inadequate Rehabilitation of the "No Physical Harm" Testimony

The proceedings were further prejudiced by counsel's failure to rehabilitate Respondent after cross-examination focused narrowly on the absence of physical injury. When Respondent testified that he suffered psychological rather than physical harm, the record was left emphasizing the phrase "no physical harm" without contextual clarification. Counsel did not redirect to underscore that Respondent had been arrested, detained, pressured into statements, and convicted in connection with political activity, nor did counsel situate those events within the broader pattern of repression directed at Navalny activists.

Persecution does not require severe physical injury; detention, coercion, conviction, and the cumulative effects of state targeting are legally relevant harms. *Matter of O-Z- & I-Z-*, 22 I&N Dec. 23 (BIA 1998). By failing to reframe the testimony within a cumulative-risk analysis, counsel allowed the record to suggest a diminished level of severity inconsistent with established asylum jurisprudence. This omission materially affected the persecution analysis and contributed to the narrowing of Respondent's claim in a manner that was not supported by the full evidentiary context.

## D. Interpretation Breakdowns and Failure to Preserve Objection

The transcript reflects repeated interpretation confusion during the hearing, including clarification issues such as "fit" versus "feet" and other exchanges requiring repetition or correction.   TR 37: 3-22 These breakdowns occurred during material testimony. No formal

10

objection was preserved, and no request was made to clarify or reconstruct potentially mistranslated statements.

Where interpretation errors affect material testimony, due process concerns are implicated. *See Matter of Tomas*, 19 I&N Dec. 464 (BIA 1987). Accurate interpretation is essential to ensure a full and fair hearing. Fragmented translation, particularly during adversarial questioning, may contribute to perceived inconsistencies that are not reflective of actual testimonial contradiction. Here, interpretation interruptions and clarifications contributed to a record that appears disjointed and, at times, imprecise. Counsel's failure to address or preserve these issues further compromised the reliability of the credibility analysis.

**E. Failure to Identify and Submit Critical Corroborating Evidence**

Former counsel failed to identify and submit a decision of the European Court of Human Rights ("ECtHR") that expressly names Respondent and confirms the political context of the underlying events. The decision is publicly accessible and appears readily upon a basic browser search of Respondent's name, and would have been discoverable through minimal diligence at the time of the hearing. It constitutes highly probative, independent corroboration of Respondent's arrest and political targeting

The omission of this evidence materially weakened Respondent's claim. The Immigration Judge's adverse credibility determination rested in part on perceived lack of reliable corroboration and uncertainty regarding the political nature of Respondent's arrest. Submission of the ECtHR decision would have provided objective confirmation of state action and political motivation, thereby reinforcing both credibility and nexus.

EOIR 16 of 47

11

At the time of the prior proceedings, Respondent was detained and lacked access to research tools or public databases. He was unaware of the ECtHR decision and reasonably relied on counsel to investigate and develop supporting evidence. The obligation to identify such readily discoverable and central documentation rested with counsel.  The European court judgment provides compelling evidence that the respondent's fear of future persecution in Russia is well-founded.

The omission materially weakened the claim, particularly where the Immigration Judge questioned corroboration and political nexus. Under *Matter of Lozada*, this failure constitutes deficient performance resulting in prejudice, as submission of the ECtHR decision would likely have altered the credibility and nexus analysis.

### V. Respondent's Challenge to the Adverse Credibility Finding

### A. Failure to Consider Medical Evidence in Assessing Demeanor-Based Credibility

The IJ made an adverse credibility finding that relied on Respondent's hesitation, nervousness, non-responsive tone, and minor memory imprecision. Those observations, however, must be evaluated in light of Respondent's documented, stress-sensitive autoimmune condition and the heightened stressors inherent in a remote, adversarial removal proceeding. The IJ did not meaningfully take into consideration that these indicators could just as plausibly be attributed to Respondent's medical condition and stress response, rather than to evasiveness or dishonesty.

Respondent testified that he suffers from vitiligo (BIA MTR Exh. R: 38). The diagnosis is confirmed by medical documentation submitted with this Motion to Reopen. BIA MTR Ex. P. This is an autoimmune disorder affecting skin pigmentation that is commonly associated with

12

heightened psychological stress and anxiety. Medical documentation establishes that (1) vitiligo is stress-sensitive, (2) psychological stress exacerbates symptoms, and (3) anxiety and depressive features are common comorbidities BIA MTR Ex. Q. Vitiligo does not cause cognitive impairment. However, high-stakes removal proceedings, prolonged detention, interpreter interruptions, and adversarial questioning are stress-amplifying conditions.

**B. The Immigration Judge's Adverse Credibility Determination Is Not Supported by Substantial Evidence**

The Immigration Judge's adverse credibility determination is not supported by substantial evidence and rests primarily on a misunderstanding of Respondent's testimony, improper weighting of immaterial omissions, and demeanor observations made during a remote video proceeding that limited reliable credibility assessment. The IJ's negative credibility finding is also independent from and ignores the substantial evidence submitted in the record. Instead of evaluating the testimony together with the corroborating documentation, the IJ treated credibility as separate from the objective evidence, without meaningfully reconciling the two.

Under the REAL ID Act, credibility determinations must be based on the totality of the circumstances and supported by specific and cogent reasons grounded in the evidentiary record. 8 U.S.C. § 1158(b)(1)(B)(iii). While an Immigration Judge may consider inconsistencies or demeanor, such findings must remain rationally connected to material aspects of the claim and must be evaluated alongside corroborating evidence.

Here, the record overwhelmingly corroborates the core factual predicate of Respondent's claim—namely, that he was arrested for politically motivated reasons. Where the central events

EOIR 18 of 47

13

are independently confirmed, peripheral discrepancies cannot sustain an adverse credibility determination.

## C. The Record Contains Independent Objective Evidence Confirming the Central Events of the Claim

This case does not present a situation in which the underlying persecution events are disputed. The government does not meaningfully contest that Respondent was arrested. The record includes:

- Photographic evidence documenting Respondent's arrest (Articles relating to Respondent's political activity and detention, showing photos of Respondent), EROP Ex. B, EROP Ex. G;

- Decision of the Moscow Court regarding administrative charges against the Respondent for participating in the rally, EROP Ex. C

These materials independently establish the occurrence of the arrest—the central fact underlying Respondent's fear of persecution.

An adverse credibility finding cannot disregard corroborating documentary evidence. Even where testimony is questioned, the adjudicator remains obligated to evaluate independent evidence supporting eligibility for relief. *See Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1287 (11th Cir. 2005).

> *"Of course, an adverse credibility determination does not alleviate the IJ's duty to consider other evidence produced by an asylum applicant. That is, the IJ must still consider all evidence introduced by the applicant. If the applicant produces no evidence other than his testimony, an adverse credibility determination is alone sufficient to support the denial of an asylum application. If, however, the applicant*

> *produces other evidence of persecution, whatever form it may take, the IJ must consider that evidence, and it is not sufficient for the IJ to rely solely on an adverse credibility determination in those instances." Forgue at 1287.*

Because objective evidence confirms the core events, the Immigration Judge improperly elevated peripheral concerns over substantiated facts.

**D. The Alleged Inconsistency Relating to the Visa Application Constitutes, at Most, a Framing or Materiality Issue Rather Than Evidence of Fabrication**

Under the REAL ID Act, inconsistencies need not go to the heart of a claim; however, credibility determinations must still be evaluated under the totality of the circumstances. Minor discrepancies must be considered in light of translation context, psychological stress, detention conditions, and the cumulative consistency of testimony. Courts have cautioned that an Immigration Judge must consider an applicant's explanation for any perceived inconsistency and may not base an adverse credibility determination on an "utterly trivial inconsistency" that, "under the total circumstances, [has] no bearing on a petitioner's veracity." *Zhi v. Holder*, 751 F.3d 1088, 1097 (9th Cir. 2014).

Here, the adverse credibility finding rests largely on peripheral discrepancies elicited during questioning. The Immigration Judge focused on issues such as references to "ten protesters" versus "several thousand" participants, protest permission requirements, the duration of time spent at protest locations, phrasing relating to military status, and the precise number of political events attended. Minor variations in such details are expected when recounting stressful political events across languages and over time and cannot outweigh otherwise consistent testimony concerning political opposition, arrest, and documented state repression.

The Immigration Judge also relied heavily on Respondent's omission of the arrest from a prior visa application. This omission does not constitute a genuine contradiction. Respondent has never denied the arrest, and his testimony has remained consistent regarding the underlying events. The issue instead concerns how Respondent interpreted the visa application question at the time it was completed.

When confronted with the visa question — "Have you ever been arrested or convicted for any offense or crime…?" — and his answer of "No," (MTR BIA Exh. R: 95), the government asserted that this conflicted with his testimony that he had been arrested in 2018.

Respondent explained that he understood the incident to be a civil matter involving only a brief detention and fine:

> *"I didn't inform about this issue at the embassy because it was a civil matter… I was detained only for a couple hours. And after that, I was released."* (MTR BIA Exh. R: 96).

He further testified:

> *"When I applied for a visa, I was told that this question was pertinent to some serious criminal offenses, not to civil matters or misdemeanors."* (MTR BIA Exh. R: 98).

A reasonable asylum applicant fleeing political persecution may interpret questions regarding arrests as referring to criminal conduct rather than politically motivated detention. Respondent reasonably believed that an arrest arising from political activity—rather than violence or

16

narcotics offenses—fell outside the intended scope of the inquiry. At most, the visa application issue raises a question of framing or perceived materiality, not fabrication of facts.

By elevating trivial differences in phrasing and numerical precision, as well as a misunderstood visa application response, over corroborated central facts, the Immigration Judge applied credibility analysis in a manner inconsistent with the statutory totality-of-the-circumstances standard.

**E. The Immigration Judge Improperly Relied on Demeanor Findings Derived From a Remote Video Hearing Without Adequately Accounting for Respondent's Medical Condition**

The Immigration Judge placed significant weight on observations of Respondent's demeanor during a Webex video hearing. While remote hearings may satisfy minimum due process requirements, they are inherently limited tools for assessing credibility.

Video proceedings restrict an adjudicator's ability to observe physical indicators traditionally associated with demeanor assessment, including subtle body language, posture, and physiological stress responses. Technical delays, camera positioning, audio lag, and screen-mediated interaction further distort conversational timing and emotional presentation.

These limitations are particularly significant because Respondent suffers from a documented stress-sensitive autoimmune condition associated with anxiety under stress. Symptoms such as hesitation, visible nervousness, irregular cadence, or momentary non-responsiveness may easily be misinterpreted as evasiveness when viewed through a video interface rather than in person.

Accordingly, demeanor findings derived from remote proceedings should be afforded reduced weight, particularly where objective evidence corroborates testimony and medical documentation explains observed presentation.

**F. The Totality of the Circumstances Supports Credibility**

When evaluated under the proper legal framework, <u>the totality of the circumstances supports Respondent's credibility</u>. Respondent's testimony regarding the core persecution events has remained consistent and is corroborated by independent documentary evidence confirming both the arrest and its political context. Any perceived discrepancy relates only to Respondent's interpretation of a visa application question, not to conflicting factual accounts. The remaining alleged inconsistencies are minor and attributable to translation issues, stress, and contextual factors inherent in recounting traumatic events. Moreover, the Immigration Judge's demeanor findings were made under technologically constrained remote proceedings without adequate consideration of Respondent's documented medical condition.

By treating peripheral issues as dispositive while failing to reconcile corroborating evidence and reasonable explanations, the Immigration Judge committed reversible error in the credibility analysis

EOIR 23 of 47

18

## G. The Adverse Credibility Finding Requires Reversal or Remand

Because the credibility determination is not supported by substantial evidence and fails to account for corroborating documentation, medical context, and the statutory totality-of-the-circumstances framework, the Board should:

- reverse the adverse credibility finding; or, alternatively,

- remand for a new credibility determination applying the correct legal standard.

The record does not demonstrate fabrication, contradiction, or implausibility in Respondent's account. Rather, it reflects a politically persecuted individual whose testimony is corroborated by independent evidence and whose perceived demeanor issues arose under medically and technologically constrained circumstances. Under the totality of the evidence, the adverse credibility determination cannot be sustained.

## VI. Impact of the ECtHR Judgment

Under *Matter of S-Y-G-*, 24 I&N Dec. 247 (BIA 2007), reopening is warranted where changed circumstances materially increase the likelihood of persecution. The ECtHR judgment establishes direct state awareness, elevates Respondent's political salience, and publicly aligns him with anti-state litigation. The Immigration Judge's "not known" to the Russian government rationale cannot survive in light of this new factual record.

## VII. Prima Facie Eligibility on the Current Record

The current record establishes prima facie eligibility for relief. Respondent has demonstrated past political activity resulting in detention, judicial recognition by the European Court of

EOIR 24 of 47

19

Human Rights of unlawful state repression, and public identification as an anti-war dissident. Newly submitted evidence further confirms Respondent's association with Navalny's Anti-Corruption Foundation, now designated a terrorist organization under Russian law, alongside escalating prosecution of political opponents and documented state awareness of Respondent's identity and activities.

When considered cumulatively, this evidence materially alters Respondent's risk profile and establishes at minimum <u>a reasonable likelihood that he can satisfy the standards for asylum</u>, withholding of removal, and protection under the Convention Against Torture. <u>The reopening standard is therefore met</u>.

## VIII. Conclusion and Requested Relief

The European Court of Human Rights judgment constitutes transformative new evidence that directly undermines the Immigration Judge's central factual premise that Respondent was not known to Russian authorities. When considered together with the escalation of repression against Navalny supporters, the terrorist designation of the Anti-Corruption Foundation, and the substantial procedural deficiencies affecting the prior proceedings—including ineffective assistance of counsel, interpretation breakdowns, and demeanor findings rendered unreliable by documented medical stress factors—the prior denial cannot stand.

EOIR 25 of 47

20

Respondent respectfully requests that the Board:

1. Grant his pending Motion for a Stay of Removal;

2. Grant the Motion to Reopen; and

3. Reverse the Immigration Judge's denial of asylum or, in the alternative, remand for further proceedings consistent with the materially altered record.

**Respectfully submitted,**

*Wallie Mason*

Wallie Mason, Esq.

Mason Immigration Law Office

9854 National Blvd #288,

Los Angeles, CA 90034

(323) 297-8440 wmason@masonimmigration.com

Counsel for Respondent/Movant

# CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2026, a true and correct copy of **SUPPLEMENTAL BRIEF IN SUPPORT OF RESPONDENT'S MOTION TO REOPEN** was electronically served via the EOIR Courts & Appeals System (ECAS) upon the Office of the Principal Legal Advisor (OPLA), New Orleans, 423 Canal Street, Suite 450, New Orleans, LA 70130,  and OPLA, 1133 Hampton Dupre Road, Pine Prairie, LA.  in accordance with applicable EOIR procedures.

**Respectfully submitted,**

*Wallie Mason*

Wallie Mason, Esq.

Mason Immigration Law Office

9854 National Blvd #288,

Los Angeles, CA 90034

(323) 297-8440 wmason@masonimmigration.com

Counsel for Respondent/Movant

# EXHIBIT O

EOIR 28 of 47

# Гражданский Правозащитный Проект
# ЗА ПРАВА ЧЕЛОВЕКА

E-mail: zaprava.s@gmail.com                                    www.zaprava.ru

February 25, 2026  *EV/ Ємичик О.А.*                    U.S. Department of Justice

I hereby confirm that I am a Russian human rights defender, officially designated as a "foreign agent" by the authorities of the Russian Federation, and a member of the non-governmental human rights organization "For Human Rights." I am personally acquainted with Russian citizen Vladislav Alekseevich Krasnov and represented his interests in Russian courts as well as before the European Court of Human Rights (ECHR).

I know Mr. Krasnov as a civic activist, a supporter of democratic principles and human rights, and a public opponent of the policies of President Vladimir Putin and the Russian Federation's actions against Ukraine. He was one of the organizers of the youth protest movement "Indefinite Protest."

On September 10, 2018, Mr. Krasnov was detained in Moscow for participating in a peaceful youth protest against pension reform and the policies of the current authorities. I represented him in court in connection with charges of participation in an "unauthorized public event," and I prepared an application to the European Court of Human Rights concerning violations of his rights to freedom of peaceful assembly, liberty and security of person, and a fair trial.

It should be noted that during that period, authorization of opposition public events in the Russian Federation was systematically denied by executive authorities or conditioned upon requirements that made meaningful public assembly impossible. In such cases, the formal classification of an event as "unauthorized" resulted from administrative refusal practices rather than unlawful conduct by participants.

Mr. Krasnov and his associates organized the protest in reliance on Article 31 of the Constitution of the Russian Federation, which guarantees citizens the right to assemble peacefully and without weapons.

On February 11, 2025, I informed Mr. Krasnov of the decision of the European Court of Human Rights, which found violations of his rights and awarded him compensation in the amount of 4,000 euros. The delay in notification occurred because I had ceased monitoring ECHR decisions after the Russian Federation withdrew from the jurisdiction of the Court and refused to implement its rulings. As a result, Mr. Krasnov was unable to submit this decision during the consideration of his asylum case on March 1, 2024, as official evidence of his persecution.

I further confirm that Mr. Krasnov served as an election observer and interacted with structures affiliated with the Anti-Corruption Foundation founded by Alexei Navalny. These organizations were designated as extremist in the Russian Federation, and related international structures were later classified as terrorist. Under current Russian law enforcement practice, even prior interaction with such organizations may serve as grounds for initiating criminal proceedings.

In addition, Mr. Krasnov has interacted with foreign media outlets and with organizations and individuals designated as "foreign agents" in the Russian Federation. Under existing legislation, such interaction may be interpreted under Articles 284.1, 282.1, or 275.1 of the Criminal Code of the Russian Federation, all of which provide for criminal liability.

In recent years, the Russian Federation has developed a practice of initiating criminal cases against individuals who publicly express anti-war views or who interact with organizations labeled as extremist, terrorist, or "foreign agents," including after their return to the country.

*EV/ Ємичик О.А.*
*25.02.2026*

Given Mr. Krasnov's public activities, the following provisions of the Criminal Code of the Russian Federation could potentially be applied:

– Article 205.5, Part 2 — participation in the activities of a terrorist organization (10 to 20 years of imprisonment);

– Article 282.1, Part 2 — participation in an extremist organization (up to 6 years of imprisonment);

– Article 207.3, Part 2 — dissemination of information concerning the Armed Forces of the Russian Federation (5 to 10 years of imprisonment);

– Article 280.3, Part 2 — repeated discrediting of the Armed Forces (up to 5 years of imprisonment);

– Article 282.3 — financing extremist activity (up to 8 years of imprisonment);

– Article 205.1 — financing terrorist activity (up to 15 years of imprisonment).

In cases involving multiple charges, Article 69 of the Criminal Code allows cumulative sentencing, with a total term that may reach up to 25 years of imprisonment.

In my professional opinion, Mr. Krasnov's return to the Russian Federation would create a substantial and realistic risk of criminal prosecution, pre-trial detention, and a lengthy prison sentence.

Furthermore, as a man of conscription age, he may be subject to compulsory military service. In the context of the ongoing armed conflict, this presents an additional risk to his life and safety.

I respectfully request that this information be taken into consideration. I am prepared to provide further clarification if necessary.

Sincerely,

O.A. Elanchik

Human Rights Defender

Expert, NGO "For Human Rights"

Еланчик О. А.

25. 02. 2026

EOIR 30 of 47

2



# EXHIBIT P

EOIR 32 of 47

# Krasnov, Vladislav

MRN: 5274053

**Office Visit** 3/4/2025
Pacific Skin Institute

Provider: Evelyn Kaovorakarn, PA (Dermatology)
Primary diagnosis: Vitiligo
Reason for Visit: Consult

## Progress Notes

Evelyn Kaovorakarn, PA (Physician Assistant) • Dermatology

3/4/2025
Folsom Clinic

**Chief concern:** vitiligo on body

**Past Medical History:** Reviewed with patient and in EMR.

**Skin Cancer History: none.**

**Allergies:** Patient has no allergy information on record.
**Medications:** Reviewed with patient and in the EMR.
**Family History:** There is no family history of melanoma skin cancer.
**Social History:** The patient does not smoke or use tobacco products.

**Physical Examination/ Assessment/ Plan:**

- Full body skin examination performed.

**Vitiligo: BSA: 50%.**
*HX*: Hx of skin lightening on face and whole body since 2016. No associated pain, burning itch. Lesions stable, do not seem to come and go. Admits FH of vitiligo, grandmother. **Prior treatment:** none.
*PE*: Round to oval confluent depigmented macules and patches, some with follicular accentuation without overlying epidermal change on eyelids, perioral, chin, areolae, bilateral axillae, abdomen, arms, wrists, dorsa of hands, groin, knees, and lower legs. Brightly fluoresces with woods lamp evaluation. Total BSA: 50%.
*AP*: Discussed the risk for autoimmune disease in patients with vitiligo. Reviewed course of vitiligo is variable and disease results from immune-mediated destruction of melanocytes. Seen in approximately 1% of the population. Treatment options discussed, including topical steroids, photochemotherapy, and Pallas laser treatment.
-- Discussed that areas of depigmentation have an increased risk for burning. Asked the patient to use broad spectrum UVA/UVB sunblock during all hours of actinic exposure as continual burns will lead to an increased risk for non-melanoma skin cancer. The importance of reapplication was also discussed
-Start triamcinolone (KENALOG) 0.1 % ointment; Apply to the affected areas of the body twice daily. Use 2 weeks on, 1 week off. May repeat. Do NOT apply to face, underarms, or groin. Dispense: 80 g; Refill: 5
- **Start hydrocortisone 2.5 % ointment**; Apply to the affected areas of the face, underarms, and groin twice daily. Use 2 weeks on, 1 week off. May repeat. Dispense: 28 g; Refill: 5
- **Start phototherapy 2-3 times per week**

**Physician's Orders For Narrow Band UVB Photochemotherapy (PA requested)**
Diagnosis: vitiligo
Booth narrow band UVB
Frequency of NBUVB photochemotherapy: three times weekly
Maximal Dose of Narrow band UVB: 1,200 mJ/cm2
Petrolatum application on the affected areas before phototherapy: Yes
Fitzpatrick Skin Type: I
Consent obtained: Yes

**Acne, Primarily Comedonal:**
*HX*: Multiple mostly smaller acne lesions on the face, chest and back present for years. Intermittently irritated. No itch. Known triggering factors: none. **Prior treatment:** none.
*PE*: Multiple open and closed comedones on the chin, chest, and upper back.
*AP*: Reviewed the pathophysiology of acne and available treatment options including topical and oral antibiotics, topical tretinoin preparations in the future in detail. I also reviewed the risks/SEs and benefits of the prescribed treatment plan in detail. All patient questions were answered.
-Start clindamycin (CLEOCIN T) 1 % gel; Apply topically 2 (two) times a day. On face, chest, and back. Dispense: 60 mL; Refill: 11
-**Start tretinoin (RETIN-A) 0.025 % cream;** Apply a pea sized amount topically to the whole face 2-3 nights weekly,

Printed by Ashley Pursell, MA at 4/28/2025 9:16 AM

Apply a pea sized amount topically to the whole face 2-3 nights weekly, then increase to nightly as tolerated.

| | Refills | Start Date | End Date |
|---|---|---|---|
| Added: triamcinolone (KENALOG) 0.1 % ointment | 5 | 3/4/2025 | — |

Apply to the affected areas of the body twice daily. Use 2 weeks on, 1 week off. May repeat. Do NOT apply to face, underarms, or groin.

## Medication List at End of Visit

As of 3/4/2025  2:07 PM

| | Refills | Start Date | End Date |
|---|---|---|---|
| azelastine (OPTIVAR) 0.05 % ophthalmic solution | — | 2/17/2025 | — |

Administer 1 drop into affected eye(s) 2 times daily. - ophthalmic
Patient-reported medication

| | Refills | Start Date | End Date |
|---|---|---|---|
| clindamycin 1 % gel | 11 | 3/4/2025 | — |

Apply topically on face BID

| | Refills | Start Date | End Date |
|---|---|---|---|
| hydrocortisone 2.5 % ointment | 5 | 3/4/2025 | — |

Apply to the affected areas of the face, underarms, and groin twice daily. Use 2 weeks on, 1 week off. May repeat.

| | Refills | Start Date | End Date |
|---|---|---|---|
| tretinoin (RETIN-A) 0.025 % cream | 11 | 3/4/2025 | — |

Apply a pea sized amount topically to the whole face 2-3 nights weekly, then increase to nightly as tolerated.

| | Refills | Start Date | End Date |
|---|---|---|---|
| triamcinolone (KENALOG) 0.1 % ointment | 5 | 3/4/2025 | — |

Apply to the affected areas of the body twice daily. Use 2 weeks on, 1 week off. May repeat. Do NOT apply to face, underarms, or groin.

## Visit Diagnoses

Primary: **Vitiligo** L80
Acne vulgaris L70.0
Multiple benign nevi D22.9

## Pharmacy Benefits

### ℞ KRASNOV, VLADISLAV  -  MEDICAL RX (MAGELLAN-CALIFORNIA MEDICAID)

Covered: **Retail, Mail Order**   Unknown: Specialty, Long-Term Care

| | | | |
|---|---|---|---|
| Member ID: 93852153H | BIN: 022659 | DOB: 6/26/1998 |
| Group ID: MEDICALRX | PCN: 6334225 | Legal sex: M |
| Group name: MEDICAL RX | | Address: 2925 PETROSYAN LN CARMICHAEL CA 95608 |

Printed by Ashley Pursell, MA at 4/28/2025 9:16 AM

3/3

# EXHIBIT Q

EOIR 35 of 47

Filed at BIA on 03/08/2026 at 12:59:08 PM (Eastern Standard Time)

Case 5:26-cv-01532-VBF-JDE    Filed 03/30/26    Page 91 of 137    Page ID #:91

An official website of the United States government

Here's how you know

FULL TEXT LINKS



Arch Dermatol Res. 2025 Jan 8;317(1):201. doi: 10.1007/s00403-024-03679-6.

# Vitiligo and the microbiome of the gut and skin: a systematic review

Alexandra Nigro [1], Alim Osman [1], Pavan Suryadevara [1], Ahuva Cices [2]

Affiliations
PMID: 39777551   DOI: 10.1007/s00403-024-03679-6

## Abstract

Vitiligo is a chronic autoimmune skin condition characterized by depigmentation due to the destruction of melanocytes. Recent research has identified potential links between vitiligo and alterations in both the gut and skin microbiomes. This systematic review aims to explore these microbiome changes and their potential role in the onset and progression of vitiligo. A comprehensive search of the PubMed, Medline (OVID), and Web of Science databases was conducted to identify studies examining the gut and/or skin microbiota in vitiligo patients. A total of six studies were included in the qualitative analysis. Data extracted included study type, patient demographics, microbiome sampling methods, bacterial diversity, and bacterial ratios. The studies were assessed using the Methodological Index for Non-Randomized Studies (MINORS) scale. The results revealed inconsistent findings regarding microbial diversity in vitiligo patients. Some studies observed decreased α-diversity in the gut microbiome, while others found an increase, particularly in patients with longer disease duration. An increased Firmicutes-to-Bacteroidetes ratio (higher levels of Firmicutes bacteria compared to Bacteroidetes) was noted in several studies, suggesting a dysbiotic gut microbiome. In the skin microbiome, similar trends of dysbiosis were observed, with alterations in bacterial diversity between lesional and non-lesional skin. The findings indicate that gut and skin microbiome changes may play a role in the pathogenesis of vitiligo. However, the data remain inconclusive due to variability in methodologies and sample sizes. Further research is needed to elucidate the clinical relevance of microbiome alterations in vitiligo, with a focus on controlling external factors such as diet and lifestyle.

**Keywords:** Bacteria; Cutaneous microbiome; Gut; Microbiome; Microbiota; Vitiligo.

© 2024. The Author(s), under exclusive licence to Springer-Verlag GmbH Germany, part of Springer Nature.

PubMed Disclaimer

## Related information

GEO Profiles

MedGen

## LinkOut – more resources

**Full Text Sources**

Springer

**Medical**

MedlinePlus Health Information

# EXHIBIT R

EOIR 37 of 47

group designation.

MS. SAMATOVA TO JUDGE

Yes, your honor.  The particular social group ties in with the political opinion.  We can mark it as "members of the governmental opposition" or "people who are anti-Putin and against government regime and anti-war."

JUDGE TO MS. SAMATOVA

That's extremely broad.  It's -- I don't see how that could be so specific to be a particular social group that would be so identifiable.  Sometimes people object, and they're silent objectors for a number of reasons.  It's difficult to determine who -- I mean, I understand his political claim.  The particular social group, though, must be defined where it's not so broad that any -- it could include anyone in the country.

MS. SAMATOVA TO JUDGE

Yes, your honor.  In that case, we can proceed under -- the main claim would be under political opinion.

JUDGE TO MS. SAMATOVA

And Convention Against Torture?

MS. SAMATOVA TO JUDGE

Correct.  And withholding of removal.

JUDGE TO MS. SAMATOVA

Okay.

JUDGE TO MR. ROSS

Anything else, Department?

MR. ROSS TO JUDGE

No, your honor.  Thank you.

JUDGE TO MS. SAMATOVA

A249-265-983                              25                              March 1, 2024

7

EOIR 38 of 47

medical condition.

JUDGE TO INTERPRETER

I'm sorry?  What did -- he was what?

INTERPRETER TO JUDGE

Partially fit.  Partially fit.

JUDGE TO INTERPRETER

Okay.  What is -- partial?

INTERPRETER TO JUDGE

Yes.  Fit.

JUDGE TO INTERPRETER

Feet?

INTERPRETER TO JUDGE

He -- yes.  Fit.  F-I-T.

JUDGE TO INTERPRETER

Oh, like flat feet?

INTERPRETER TO JUDGE

No.  No.  He was -- you know, like, he -- due to his medical condition, he was unfit or he was partially fit to serve in the army.

MR. ROSS TO JUDGE

Unfit.

JUDGE FOR THE RECORD

Unfit.

INTERPRETER TO JUDGE

Yeah.  He -- yeah.  Unfit.  Yes.  He was unfit.

JUDGE TO INTERPRETER

A249-265-983                    37                    March 1, 2024

Oh, unfit.

INTERPRETER TO JUDGE

Yeah.  Yeah.  No -- or partially fit.

JUDGE FOR THE RECORD

Partial unfit.

JUDGE TO MR. KRASNOV

And why were you partially -- deemed partially unfit?

MR. KRASNOV TO JUDGE

Oh, because I have a skin disease.  Vitiligo.

INTERPRETER FOR THE RECORD

Skin disease.  Vitiligo.

MS. SAMATOVA TO INTERPRETER

Vitiligo, I believe.

INTERPRETER FOR THE RECORD

Vitiligo.  Yeah.  Vitiligo.

JUDGE TO MR. KRASNOV

But it's not a full waiver?  It's a partial waiver?

MR. KRASNOV TO JUDGE

It's not a partial waiver, but I'm -- I am not obliged to serve in the army during the peaceful time.

JUDGE TO MR. KRASNOV

Were you ever served with a summons to serve in the military?

MR. KRASNOV TO JUDGE

No.  When I was free, I didn't get anything.  But maybe right now, yes, I get it.

JUDGE TO MR. KRASNOV

A249-265-983                                  38                              March 1, 2024

9

I'm so sorry.  I need a repeat.  This is the interpreter.  I need to repeat him.

MR. KRASNOV TO MS. SAMATOVA

I was a volunteer for the anti-corruption fund, organized by Alexei Navalny.  And also, I organized a nonstop movement -- protest.

MS. SAMATOVA TO JUDGE

Your honor, for the purpose of this hearing, the nonstop protest --

JUDGE TO MS. SAMATOVA

He can explain.

MS. SAMATOVA TO JUDGE

-- that is referred to in our evidence.  It's also called the "indefinite protest" and "termless protest."  So, I just want to make sure that these are all referring to the same --

JUDGE TO MS. SAMATOVA

Okay.

MS. SAMATOVA TO JUDGE

-- movement, because every interpretation translates it different.  But -- just so we know that we're talking about the same thing.

JUDGE TO MS. SAMATOVA

It's the indefinite protest.  Correct?

MS. SAMATOVA TO JUDGE

Indefinite or termless.  Yes.

JUDGE TO MS. SAMATOVA

And he can explain what that is.

MS. SAMATOVA TO JUDGE

Yes.  Yes.  We'll get into that.

JUDGE TO MR. ROSS

Sometimes, if -- it takes a while to get through your firewall --

MR. ROSS TO JUDGE

Right.  Between the two agencies.  Sure.

JUDGE TO MR. ROSS

You can ask him some questions.  Go ahead, Department.

MR. ROSS TO MR. KRASNOV

Sir, the Department of Homeland Security has introduced some additional evidence in your case.  And that evidence is your visa application that you submitted to the United States Department of State.  According to the visa application, you submitted it on November 9th of 2022.  The visa application asks you many questions.  And I am going to read one of those questions to you right now.  "Have you ever been arrested or convicted for any offense or crime, even though subject of a pardon, amnesty, or other similar action?"  And your response to that question was "No."  And you answered that question, like I said, in November of 2022.  But you testified under oath today that you were arrested in September of 2018. You -- then you said you were indicted and you were convicted.  So, your testimony is inconsistent with your visa application that you submitted to the State Department.  And you just testified under oath today that you were truthful in your responses on your visa application.  You testified you did not provide any false information to the State Department in your visa application.  Do you have any explanation?

MR. KRASNOV TO MR. ROSS

You know, I was apprehended and -- by the police and a report was filed.  It was a civil matter.  The fine was imposed and I was charged with a civil misdemeanor.  I didn't --

A249-265-983                                    95                                    March 1, 2024

INTERPRETER FOR THE RECORD

And I am so sorry.  I need him to repeat.

INTERPRETER TO MR. KRASNOV

[untranslated]?

MR. KRASNOV TO INTERPRETER

What do you want to clarify?

MR. ROSS TO MR. KRASNOV

Sir --

INTERPRETER FOR THE RECORD

I want him to --

MR. ROSS TO INTERPRETER

Oh, I'm sorry.  Interpreter, are you talking to --

INTERPRETER TO MR. ROSS

Yeah.  I want him to answer -- to repeat the last sentence he said in Russian.

MR. ROSS TO INTERPRETER

Okay.

MR. KRASNOV TO MR. ROSS

And I didn't inform about this issue at the embassy because it was a civil matter. And I wasn't arrested for several days.  I was detained only for a couple hours.  And after that, I was released.

MR. ROSS TO MR. KRASNOV

Sir, your asylum application that you filed with the assistance of your attorney says -- quote -- "In 2018, I was arrested."  End quote.  In your interview --

MR. KRASNOV TO MR. ROSS

[untranslated].

A249-265-983                    96                    March 1, 2024

MR. ROSS TO JUDGE

The question is for the respondent, not for respondent's counsel.

MS. SAMATOVA TO MR. ROSS

What is the question, counsel, if you may state that?

MR. ROSS TO MS. SAMATOVA

The question is, "How do you explain that?"

JUDGE TO MS. SAMATOVA

"How do you explain the difference from the visa application and your statement on your asylum application, in which you state that you were arrested?"

MR. KRASNOV TO MR. ROSS

When I applied for a visa, I was told that this question was pertinent to some serious criminal offenses, not to civil matters or misdemeanors.

MR. ROSS TO MR. KRASNOV

Well, that's not what the question says. The question says, "Have you ever been arrested or convicted for any offense or crime?" It doesn't say misdemeanors are excepted. Do you have a response?

MR. KRASNOV TO MR. ROSS

You know, maybe it's some kind of -- my misunderstanding, I could say, about some penalties or fines.

MR. ROSS TO MR. KRASNOV

Do you speak English?

MR. KRASNOV TO MR. ROSS

Not well.

MR. ROSS TO MR. KRASNOV

In your visa application, it says, "Provide a list of languages you speak," and you

A249-265-983                        98                     March 1, 2024

13

# EXHIBIT S

EOIR 45 of 47



Learn more about **LSEG**

 Newsletters Q   Sign In   Subscribe - $1/wk   ☰

# Russia breached rights in Chechnya-European court

By **Reuters**

August 9, 2007 2:10 PM PDT · Updated August 9, 2007

 

MOSCOW, June 21 (Reuters) - Russian agents broke into a Chechen woman's house and murdered her and her husband, brother and son after she complained of ill treatment during an earlier detention, the European Court of Human Rights ruled on Thursday.

The ruling against Russia is the latest in a series of cases over the past year in which the court has found Russian forces guilty of human rights abuses during the second Chechen war which started in 1999.

Zura Bitiyeva and her family members died in May 2003 in the raid, three years after she had been detained by Russian forces.

The court also ruled Russia had failed to launch a proper investigation into the killings and it awarded Bitiyeva's daughter, who lives in Germany, 85,000 euros in damages.

But the Strasbourg-based court rejected most of the accusations against Russia filed by another Chechen. It said Vyacheslav Kantyrev had been kept in inhumane conditions during detention in 2002 but there was not enough evidence to show he had been ill treated.

14

3/2/26, 6:02 PM    Filed at BL4.com, 03/02/2026 at 12:58:28 AM (Eastern Standard Time)    Russia breached rights in Chechnya European court | Reuters

Our Standards: **The Thomson Reuters Trust Principles.** ↗

Suggested Topics:

⊂⊃

Purchase Licensing Rights



15

**Exhibit F — Emergency Stay of Removal**

30



**U.S. Department of Justice**

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

*5107 Leesburg Pike, Suite 2000*
*Falls Church, Virginia 22041*

**Mason, Wallie Helen**
**Mason Immigration Law Office**
**9854 National Blvd #288**
**Los Angeles CA 90034**

**DHS/ICE Office of Chief Counsel - OAK**
**1010 East Whatley Road**
**Oakdale LA 71463-1128**

**Name: KRASNOV, VLADISLAV**                    A▮▮▮▮▮▮▮▮

**Date of this Notice: 03/09/2026**

Enclosed is a copy of the Board's stay decision.

Sincerely,

John Seiler
Acting Chief Clerk

Enclosure

Userteam: <u>Paralegal</u>

**NOT FOR PUBLICATION**

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

MATTER OF:

Vladislav █████████████████████

Respondent

**FILED**

Mar 09, 2026

ON BEHALF OF RESPONDENT: Wallie H Mason, Esquire

IN REMOVAL PROCEEDINGS
On Motion for Stay of Removal before the Board of Immigration Appeals

Before: Volkert, Appellate Immigration Judge

VOLKERT, Appellate Immigration Judge

STAY ORDER

The respondent has filed a request for a stay of removal while a motion to reopen is pending with the Board of Immigration Appeals. After consideration of all the information, the Board has concluded that a stay of removal is warranted.

Accordingly, the following order shall be entered.

ORDER: The request for stay of removal is granted.

**Exhibit G — Medical Records**

31

# Krasnov, Vladislav

MRN: 5274053

**Office Visit** 9/26/2025

Pacific Skin Institute

Provider: **Evelyn Kaovorakarn, PA (Dermatology)**
Primary diagnosis: **Vitiligo**
Reason for Visit: **Follow-up**

## Progress Notes

Evelyn Kaovorakarn, PA (Physician Assistant) • Dermatology

09/26/2025, last seen 6/20/2025
Sacramento Clinic

**Chief concern:** vitiligo on body

**Past Medical History:** Reviewed with patient and in EMR.

*Skin Cancer History: none.*

**Allergies:** Patient has no known allergies.
**Medications:** Reviewed with patient and in the EMR.
**Family History:** There is no family history of melanoma skin cancer.
**Social History:** The patient does not smoke or use tobacco products.

**Physical Examination/ Assessment/ Plan:**

- Full body skin examination performed 6/20/2025

*Vitiligo: BSA: 50%: improving, not at patient's treatment goal*
*HX*: Today, patient reports an improvement with Opzelura, and phototherapy. Admits not using Opzelura consistently and not doing the phototherapy 3 times a week as prescribed. Notices some area of repigmentation but continues to have light spots on face, hands, arms, and legs. No new white spot since last visit. Hx of skin lightening on face and whole body since 2016. No associated pain, burning itch. Lesions stable, do not seem to come and go. Admits FH of vitiligo, grandmother. **Prior treatment:** none.
*PE*: Round to oval confluent depigmented macules and patches, some with follicular accentuation without overlying epidermal change on eyelids, perioral, chin, areolae, bilateral axillae, abdomen, arms, wrists, dorsa of hands, groin, knees, and lower legs. Brightly fluoresces with woods lamp evaluation. Total BSA: 50%.
*AP*: Discussed the risk for autoimmune disease in patients with vitiligo. Reviewed course of vitiligo is variable and disease results from immune-mediated destruction of melanocytes. Seen in approximately 1% of the population. Treatment options discussed, including topical steroids, photochemotherapy, and Pallas laser treatment.
-- Discussed that areas of depigmentation have an increased risk for burning. Asked the patient to use broad spectrum UVA/UVB sunblock during all hours of actinic exposure as continual burns will lead to an increased risk for non-melanoma skin cancer. The importance of reapplication was also discussed
**-Hold triamcinolone (KENALOG) 0.1 % ointment**; Apply to the affected areas of the body twice daily. Use 2 weeks on, 1 week off. May repeat. Do NOT apply to face, underarms, or groin.  Dispense: 80 g; Refill: 5
**- Hold hydrocortisone 2.5 % ointment**; Apply to the affected areas of the face, underarms, and groin twice daily. Use 2 weeks on, 1 week off. May repeat.  Dispense: 28 g; Refill: 5
**- Continue ruxolitinib (Opzelura) 1.5 % cream (samples provided, PA requested)**; Apply 1 Application topically 2 (two) times a day. To the affected areas of the face, hands, arms, and legs, do not exceed 10% BSA.  Dispense: 60 g; Refill: 5
**- Continue phototherapy 3 times per week**

**Physician's Orders For Narrow Band UVB Photochemotherapy**
Diagnosis: vitiligo
Booth narrow band UVB
Frequency of NBUVB photochemotherapy: three times weekly
Maximal Dose of Narrow band UVB: 1,200 mJ/cm2
Petrolatum application on the affected areas before phototherapy: Yes
Fitzpatrick Skin Type: I
Consent obtained: Yes

*Acne, Primarily Comedonal:*
*HX*: Today, patient reports minimal improvement with clindamycin, tretinoin, BPO wash. States he use all the topical and wash as prescribed for 1 month with no improvement then discontinued. Hx of Multiple mostly smaller acne lesions on the face, chest and back present for years. Intermittently irritated. No itch. Known triggering factors: none.

**Prior treatment:** none.

_PE_: Multiple open and closed comedones on the chin, chest, and upper back.

_AP_: Reviewed the pathophysiology of acne and available treatment options including topical and oral antibiotics, topical tretinoin preparations in the future in detail. I also reviewed the risks/SEs and benefits of the prescribed treatment plan in detail. All patient questions were answered.

- Patient prefers to avoid oral antibiotic.

- **Restart clindamycin (CLEOCIN T) 1 % gel;** Apply topically 2 (two) times a day. On face, chest, and back. Dispense: 60 mL; Refill: 11

- **Restart tretinoin (RETIN-A) 0.025 % cream;** Apply a pea sized amount topically to the whole face 2-3 nights weekly, then increase to nightly as tolerated.  Dispense: 45 g; Refill: 11

- **RestartOTC benzoyl peroxide creamy acne wash, 4-5% for face and 10% for body, once daily.** Lather then rinse well. Patient warned benzoyl peroxide may bleach dark clothing and towels, so must rinse well.

- Use a sensitive skin cleanser (Cetaphil) when washing face a second time in day.

- Use moisturizer with sunscreen on face every morning. If still dry, may use a sensitive skin moisturizer at night. This will help increase tolerance to retinoids.

- Patient advised to avoid picking and scratching to prevent/mitigate against scarring.

_**Benign-appearing nevi:**_

_HX_: Multiple brown, flat, and fleshy lesions on the trunk and extremities present for years. Asymptomatic. No prior treatment of any of these lesions.

_PE_: Multiple tan to brown macules and papules with even border and color and benign pigment network on the trunk and extremities.

_AP_: Continue observation, photoprotection, and photoprotection clothing. Sunscreen recommendations provided in AVS.

- Recommend Sunscreen: broad-spectrum, SPF 50, zinc oxide, and tinted.

**Medications and Education Review:**  We discussed risks, benefits and proper use of dermatological medications with the patient who verbalized understanding. Patient was encouraged to perform self-skin examination approximately once/month and RTC with any new changing or concerning lesions.

**Follow up:** 3 months

_**Electronically signed by:**_
Evelyn Kaovorakarn, PA-C, DMSc
Pacific Skin Institute

Electronically signed by Evelyn Kaovorakarn, PA at 9/29/2025  8:33 AM

## Instructions

📅 Return in about 3 months (around 12/26/2025) for Recheck.

## Additional Documentation

SmartForms:  PATIENT ROOM

## Communications

## Orders Placed

None

## Medication Changes

As of 9/26/2025  9:03 AM

None

## Medication List at End of Visit

As of 9/26/2025  9:03 AM

| | Refills | Start Date | End Date |
|---|---|---|---|
| **azelastine (OPTIVAR) 0.05 % ophthalmic solution** | — | 2/17/2025 | — |
| Administer 1 drop into affected eye(s) 2 times daily. - ophthalmic | | | |
| Patient-reported medication | | | |
| **clindamycin 1 % gel** | 11 | 3/4/2025 | — |
| Apply topically on face BID | | | |
| **hydrocortisone 2.5 % ointment** | 5 | 3/4/2025 | — |
| Apply to the affected areas of the face, underarms, and groin twice daily. Use 2 weeks on, 1 week off. May repeat. | | | |
| **ruxolitinib (Opzelura) 1.5 % cream** | 5 | 6/20/2025 | — |
| Apply 1 Application topically 2 (two) times a day. To the affected areas of the face, hands, arms, and legs, do not exceed 10% BSA. - topical (top) | | | |
| **tretinoin (RETIN-A) 0.025 % cream** | 11 | 3/4/2025 | — |
| Apply a pea sized amount topically to the whole face 2-3 nights weekly, then increase to nightly as tolerated. | | | |
| **triamcinolone (KENALOG) 0.1 % ointment** | 5 | 3/4/2025 | — |
| Apply to the affected areas of the body twice daily. Use 2 weeks on, 1 week off. May repeat. Do NOT apply to face, underarms, or groin. | | | |

## Visit Diagnoses

Primary: **Vitiligo** L80
Acne vulgaris L70.0
Multiple benign nevi D22.9

## Pharmacy Benefits

No pharmacy benefits eligibility data found for this visit.

# Krasnov, Vladislav

**Office Visit** 6/20/2025
Pacific Skin Institute

Provider: **Evelyn Kaovorakarn, PA (Dermatology)**
Primary diagnosis: **Acne vulgaris**
Reason for Visit: **Follow-up**

## Progress Notes

Evelyn Kaovorakarn, PA (Physician Assistant) • Dermatology

6/20/2025, last seen 3/4/2025
Sacramento Clinic

**Chief concern:** vitiligo on body

**Past Medical History:** Reviewed with patient and in EMR.

*Skin Cancer History: none.*

**Allergies:** Patient has no known allergies.
**Medications:** Reviewed with patient and in the EMR.
**Family History:** There is no family history of melanoma skin cancer.
**Social History:** The patient does not smoke or use tobacco products.

**Physical Examination/ Assessment/ Plan:**

- Full body skin examination performed

*Vitiligo: BSA: 50%.*
<u>HX</u>: Today, patient reports no improvement with triamcinolone, hydrocortisone, and phototherapy for 3 months. Continues to have light spots on face, hands, arms, and legs. Hx of skin lightening on face and whole body since 2016. No associated pain, burning itch. Lesions stable, do not seem to come and go. Admits FH of vitiligo, grandmother. **Prior treatment:** none.
<u>PE</u>: Round to oval confluent depigmented macules and patches, some with follicular accentuation without overlying epidermal change on eyelids, perioral, chin, areolae, bilateral axillae, abdomen, arms, wrists, dorsa of hands, groin, knees, and lower legs. Brightly fluoresces with woods lamp evaluation. Total BSA: 50%.
<u>AP</u>: Discussed the risk for autoimmune disease in patients with vitiligo. Reviewed course of vitiligo is variable and disease results from immune-mediated destruction of melanocytes. Seen in approximately 1% of the population. Treatment options discussed, including topical steroids, photochemotherapy, and Pallas laser treatment.
-- Discussed that areas of depigmentation have an increased risk for burning. Asked the patient to use broad spectrum UVA/UVB sunblock during all hours of actinic exposure as continual burns will lead to an increased risk for non-melanoma skin cancer. The importance of reapplication was also discussed
**-Continue triamcinolone (KENALOG) 0.1 % ointment**; Apply to the affected areas of the body twice daily. Use 2 weeks on, 1 week off. May repeat. Do NOT apply to face, underarms, or groin.  Dispense: 80 g; Refill: 5
**- Continue hydrocortisone 2.5 % ointment**; Apply to the affected areas of the face, underarms, and groin twice daily. Use 2 weeks on, 1 week off. May repeat.  Dispense: 28 g; Refill: 5
**- Start ruxolitinib (Opzelura) 1.5 % cream (samples provided, PA requested)**; Apply 1 Application topically 2 (two) times a day. To the affected areas of the face, hands, arms, and legs, do not exceed 10% BSA.  Dispense: 60 g; Refill: 5
**- Continue phototherapy 3 times per week**

**Physician's Orders For Narrow Band UVB Photochemotherapy**
Diagnosis: vitiligo
Booth narrow band UVB
Frequency of NBUVB photochemotherapy: three times weekly
Maximal Dose of Narrow band UVB: 1,200 mJ/cm2
Petrolatum application on the affected areas before phototherapy: Yes
Fitzpatrick Skin Type: I
Consent obtained: Yes

*Acne, Primarily Comedonal:*
<u>HX</u>: Today, patient reports minimal improvement with clindamycin and tretinoin. Did not start BPO wash as advised. Hx of Multiple mostly smaller acne lesions on the face, chest and back present for years. Intermittently irritated. No itch. Known triggering factors: none. **Prior treatment:** none.
<u>PE</u>: Multiple open and closed comedones on the chin, chest, and upper back.

*AP*: Reviewed the pathophysiology of acne and available treatment options including topical and oral antibiotics, topical tretinoin preparations in the future in detail. I also reviewed the risks/SEs and benefits of the prescribed treatment plan in detail. All patient questions were answered.

**-Continue clindamycin (CLEOCIN T) 1 % gel;** Apply topically 2 (two) times a day. On face, chest, and back. Dispense: 60 mL; Refill: 11

**-Continue tretinoin (RETIN-A) 0.025 % cream;** Apply a pea sized amount topically to the whole face 2-3 nights weekly, then increase to nightly as tolerated. Dispense: 45 g; Refill: 11

**- Start OTC benzoyl peroxide creamy acne wash, 4-5% for face and 10% for body, once daily.** Lather then rinse well. Patient warned benzoyl peroxide may bleach dark clothing and towels, so must rinse well.

- Use a sensitive skin cleanser (Cetaphil) when washing face a second time in day.

- Use moisturizer with sunscreen on face every morning. If still dry, may use a sensitive skin moisturizer at night. This will help increase tolerance to retinoids.

- Patient advised to avoid picking and scratching to prevent/mitigate against scarring.

***Benign-appearing nevi:***
*HX*: Multiple brown, flat, and fleshy lesions on the trunk and extremities present for years. Asymptomatic. No prior treatment of any of these lesions.

*PE*: Multiple tan to brown macules and papules with even border and color and benign pigment network on the trunk and extremities.

*AP*: Continue observation, photoprotection, and photoprotection clothing. Sunscreen recommendations provided in AVS.

- Recommend Sunscreen: broad-spectrum, SPF 50, zinc oxide, and tinted.

**Medications and Education Review:** We discussed risks, benefits and proper use of dermatological medications with the patient who verbalized understanding. Patient was encouraged to perform self-skin examination approximately once/month and RTC with any new changing or concerning lesions.

**Follow up:** 3 months

***Electronically signed by:***
Evelyn Kaovorakarn, PA-C, DMSc
Pacific Skin Institute

Electronically signed by Evelyn Kaovorakarn, PA at 6/23/2025  8:53 AM

## Instructions

📅 Return in about 3 months (around 9/20/2025) for Recheck.

After Visit Summary (English Snapshot) – Printed 6/20/2025

## Additional Documentation

SmartForms:  PATIENT ROOM

## Communications

📧 Chart Routed to Any Yang, MA

## Orders Placed

None

## Medication Changes

As of 6/20/2025 10:27 AM

| | Refills | Start Date | End Date |
|---|---|---|---|
| **Added: ruxolitinib (Opzelura) 1.5 % cream** | 5 | 6/20/2025 | — |

Apply 1 Application topically 2 (two) times a day. To the affected areas of the face, hands, arms, and legs, do not exceed 10% BSA. - topical (top)

## Medication List at End of Visit

As of 6/20/2025 10:27 AM

| | Refills | Start Date | End Date |
|---|---|---|---|
| **azelastine (OPTIVAR) 0.05 % ophthalmic solution** | — | 2/17/2025 | — |
| Administer 1 drop into affected eye(s) 2 times daily. – ophthalmic | | | |
| Patient-reported medication | | | |
| **clindamycin 1 % gel** | 11 | 3/4/2025 | — |
| Apply topically on face BID | | | |
| **hydrocortisone 2.5 % ointment** | 5 | 3/4/2025 | — |
| Apply to the affected areas of the face, underarms, and groin twice daily. Use 2 weeks on, 1 week off. May repeat. | | | |
| **ruxolitinib (Opzelura) 1.5 % cream** | 5 | 6/20/2025 | — |
| Apply 1 Application topically 2 (two) times a day. To the affected areas of the face, hands, arms, and legs, do not exceed 10% BSA. – topical (top) | | | |
| **tretinoin (RETIN-A) 0.025 % cream** | 11 | 3/4/2025 | — |
| Apply a pea sized amount topically to the whole face 2-3 nights weekly, then increase to nightly as tolerated. | | | |
| **triamcinolone (KENALOG) 0.1 % ointment** | 5 | 3/4/2025 | — |
| Apply to the affected areas of the body twice daily. Use 2 weeks on, 1 week off. May repeat. Do NOT apply to face, underarms, or groin. | | | |

## Visit Diagnoses

Primary: **Acne vulgaris** L70.0
Vitiligo L80
Lentigines L81.4
Multiple benign nevi D22.9

## Pharmacy Benefits

No pharmacy benefits eligibility data found for this visit.

| Encounter | 05-20-2024 09:54 AM |
|---|---|
| **KRASNOV, VLADISLAV**     Unique ID# A249265983     **Gender: Male** | **DOB 06-26-1998** |

| Dictation: | PROVIDER VISIT - SICK CALL:<br>Patient Name:    VLADISLAV KRASNOV<br>ID#:             A249265983<br>DOB:             06-26-1998<br>Location:        5  F-2-5<br><br>Date/Time:       05-20-2024 Mon / 09:54<br><br>VITAL SIGNS:<br>Blood Pressure        105/66 mmHg<br>Temperature           98.5 °F / 36.94 °C<br>Pulse                 80 /minute<br>Respiration           18 /minute<br>Pulse Oxygen          97%<br><br>ALLERGIES:<br>     No Known Drug Allergies<br>     No Known Food Allergy<br>     No Known Latex Allergy<br><br>CURRENT MEDICATIONS:<br>SYSTANE LUBRIC EYE DROPS, 1 SOL ophthalmic 2 times per day for 365 days  as needed<br><br>SUBJECTIVE:<br>Complains of chronic vitiligo. Onset 2014. No prior treatment. Pt is asking for diagnostic evidence<br>so that he can provide to ICE authorities. Pt does not want treatment at this time.<br><br>REVIEW OF SYSTEMS::<br><br>Review of Systems:<br> Unless otherwise stated, a ten point review of systems is performed, and they are normal.<br><br>General:<br>     Healthy appearing.<br>     No acute distress.<br><br>Skin:<br>     Warm and dry. Depigmented areas bilateral hands, forearms, lesser defined areas of<br>hypopigmentation bilateral feet.<br><br>ASSESSMENT:<br>     Ventiligo<br><br>PLAN:<br>Labs - Specimen to be collected for following -<br>Order Type - Lab CBC and CMP<br>Instructions -<br>     Collect specimen for CBC and CMP, TSH, Free T3, total T4<br>Collect Labs 05/29/2024<br><br>Follow up prn.<br><br>Medication<br><br>     Start medication -<br>SYSTANE LUBRIC EYE DROPS,  #730, Sig: 1 SOL topical 2 times per day for 365 days<br><br>ELECTRONIC SIGNATURE:<br>Electronically signed by David Vizinat, Medical Provider,FNP-C on 05-20-2024 10:08:44 AM (Type: Med<br>Provider) |
| Vitals: | Blood Pressure: 105/66<br>Temperature: 98.5<br>Pulse: 80<br>Pulse Oxygen: 97<br>Respirations: 18 |
| Condition Related To: | |

*vitiligo* (handwritten)



CorrecTek

142

KRASNOV, VLADISLAV
Unique ID# A249265983

| | |
|---|---|
| Dates: | Current Illness Date:<br>1st Date Of Illness:<br>Unable To Work Dates:<br>Hospitalization Dates: |
| Diagnosis: | |
| Procedures: | |
| Providers: | Attending Provider: Vizinat, David, Medical Provider,FNP-C, ID: |
| Facility: | Allen Parish Public Safety Complex |
| Encounter Type: | Provider Sick Call - Scheduled |
| Sign Off # 1 | |
| | Electronically signed by David Vizinat, Medical Provider,FNP-C on 05-20-2024 10:08:44 AM (Type: Med Provider) |

143

| Order | 05-20-2024 10:02 AM |
|---|---|
| **KRASNOV, VLADISLAV**    Unique ID# A249265983    Gender: Male    DOB 06-26-1998 | |
| Order: | Lab CBC and CMP |
| Instructions: | Collect specimen for CBC and CMP, TSH, Free T3, total T4 |
| Status: | Completed |
| Entered by: | DVIZINAT |
| Approval Status: | Pending |
| Approved/Rejected on: | |
| Approved/Rejected by: | |
| Requested Start Date: | Wed 05-22-2024 |
| Requested Start Shift: | Midday |
| Requested End Date: | Wed 05-22-2024 |
| Requested End Shift: | Midday |
| Actual Start Date: | Wed 05-29-2024 |
| Actual Start Shift: | Midday |
| Actual End Date: | Wed 05-29-2024 |
| Actual End Shift: | Midday |
| Renewal Date: | |
| Assigned to: | |
| Requesting Provider: | David Vizinat, Medical Provider,FNP-C |
| Supervising Department: | Medical |
| Implementation Department: | Medical |
| Verbal Order?: | No |
| Verbal Order Type: | |
| Facility: | Allen Parish Public Safety Complex |
| Discontinued by: | |
| Comments: | |



144

KRASNOV, VLADISLAV
Unique ID# A249265983

| **External Document** | **05-20-2024 11:04 AM** |
|---|---|
| **KRASNOV, VLADISLAV**      **Unique ID# A249265983**    **Gender: Male** | **DOB 06-26-1998** |

| | |
|---|---|
| Entered By: | ADMINLM |
| Description: | Sick Call Request |
| Comments: | Paper Sick Call 05/19/2024 |
| File Name: | 2024\2024_05_30\KRASNOVVLADISLAV_SickCallRequest.PDF |
| Preview: | |

**Printed Record to Follow**

Printed: 06-26-2024 10:57 AM  Printed By: ADMINMES     Generated by     Software Version: 7.1.6.54

CorrecTek

145

## Allen Parish Sheriff's Office
### HEALTHCARE REQUEST (SOLICITUD DE SALUD)

Name (Nombre): Vladislav Krasnov    Date (Fecha): 05.18.24

Social Security # (Número de seguridad social) _____

Alien # (Número de extranjero): 249 265 983    DOB (Fecha de nacimiento): 06.26.88

☑ Medical (Médico)    ☐ Mental Health (Salud mental)    ☐ Dental (Dental)    ☐ Other (Otro) _____

Nature of problem or request (be specific) Naturaleza del problema o solicitud (se específico):

I losing my vision and have a lot of discomfort with my eyes. My skin sickness progressing. I need to talk with doctor.

### DO NOT WRITE BELOW THIS LINE          NO ESCRIBA DEBAJO DE ESTA LINEA

Vital Signs: Blood Pressure 122/78 Pulse 92 Respirations 110 Temperature 97.1 Pulse Ox 98%

Received 05.19.24 @ 0500 - Jm

Triaged 05.19.24 @ 0515 - Nonurgent - Jm

Scheduled 05.19.24 @ 0600 - Jm

Completed 05.19.24 @ 1312 - Jm

☐ Treat with standing orders _____

Refer to:    ☐ ER _____

☐ PCP _____

☐ Mental Health _____

☐ Dentist _____

☐ Other _____

J. McCallon, Lpn

Nurse Signature

05-19-24 1312

Date/Time

***This is a confidential document and should only be placed in a designated area, medical box, or given directly to medical staff.***

| Encounter | 05-29-2024 09:20 AM |
|---|---|
| **KRASNOV, VLADISLAV**    **Unique ID# A249265983**    **Gender: Male**    **DOB 06-26-1998** | |

| | |
|---|---|
| **Dictation:** | NURSE OBSERVATION NOTE:<br><br>Name VLADISLAV KRASNOV<br>Date 05-29-2024 Wed<br>ID   A249265983<br><br><br>Reason For Note:Lab Draw<br><br>Observation Documentation:<br><br>    COMMENTS:<br><br>    Detainee escorted by CO to medical for lab draw.  Detainee seated while RN explained procedure. Understanding verbalized and verbal consent given.  Venipuncture performed in left a.c. space using aseptic technique x 1 attempt.  1 SST tube and 1 lavender tube collected.  Gauze placed with pressure on venipuncture site.  Site clean and dry with no redness or swelling observed.  Detainee tolerated procedure well with no concerns. Detainee escorted back to dorm by CO.<br><br><br>Signature:<br><br>Electronic Signature:<br>Electronically signed by Latosha Morehead, RN on 05-29-2024 09:20:37 AM (Type: RN) |
| **Vitals:** | |
| **Condition Related To:** | |
| **Dates:** | Current Illness Date:<br>1st Date Of Illness:<br>Unable To Work Dates:<br>Hospitalization Dates: |
| **Diagnosis:** | |
| **Procedures:** | |
| **Providers:** | Attending Provider: Morehead, Latosha, RN, ID: |
| **Facility:** | Allen Parish Public Safety Complex |
| **Encounter Type:** | Nurse Observation - Medical Observation |
| **Sign Off # 1** | Electronic Signature: Electronically signed by Latosha Morehead, RN on 05-29-2024 09:20:37 AM (Type: RN) |



KRASNOV, VLADISLAV
Unique ID# A249265983

| Order | 05-29-2024 09:46 AM |
|---|---|
| **KRASNOV, VLADISLAV**    Unique ID# A249265983    **Gender: Male**    DOB 06-26-1998 | |

| Order: | Provider Visit |
|---|---|
| Instructions: | SICK CALL:<br>    Follow-Up - Review Labs -Chronic vitiligo |
| Status: | Completed |
| Entered by: | ADMINLM |
| Approval Status: | Approved |
| Approved/Rejected on: | Wed 05-29-2024 |
| Approved/Rejected by: | Latosha Morehead, RN |
| Requested Start Date: | Tue 06-04-2024 |
| Requested Start Shift: | AM |
| Requested End Date: | Thu 06-06-2024 |
| Requested End Shift: | Midday |
| Actual Start Date: | Tue 06-04-2024 |
| Actual Start Shift: | AM |
| Actual End Date: | Tue 06-04-2024 |
| Actual End Shift: | AM |
| Renewal Date: | |
| Assigned to: | |
| Requesting Provider: | Latosha Morehead, RN |
| Supervising Department: | Medical |
| Implementation Department: | Medical |
| Verbal Order?: | No |
| Verbal Order Type: | |
| Facility: | Allen Parish Public Safety Complex |
| Discontinued by: | |
| Comments: | |


148

KRASNOV, VLADISLAV
Unique ID# A249265983

External Document: 05-31-2024 09:00 AM
Record 86 of Set #1 of 91 total records, Page 86 of 91

| **External Document** | **05-31-2024 09:00 AM** |
|---|---|

| **KRASNOV, VLADISLAV** | **Unique ID# A249265983** | **Gender: Male** | **DOB ████ 1998** |
|---|---|---|---|

| | |
|---|---|
| Entered By: | ADMINLM |
| Description: | Labs |
| Comments: | Labs Collected 05/29/2024 |
| File Name: | 2024\2024_05_31\KRASNOVVLADISLAV_Labs.PDF |
| Preview: | |

Printed Record to Follow


149

| Encounter | 06-20-2024 01:46 PM |
|---|---|
| **KRASNOV, VLADISLAV**    Unique ID# A249265983    **Gender: Male** | **DOB 06-26-1998** |

| | |
|---|---|
| **Dictation:** | NURSE OBSERVATION NOTE:<br>Name VLADISLAV KRASNOV<br>Date 06-20-2024 Thu<br>ID   A249265983<br><br>Reason For Note: Request for medical records and lab results<br><br>VITAL SIGNS:<br>Blood Pressure        122/70 mmHg<br>Temperature           97.3 °F / 36.28 °C<br>Pulse                 74 /minute<br>Respiration           20 /minute<br>Pulse Oxygen          99%<br><br>Interpreter ID#/Name:N/A-Speaks English<br><br>Observation Documentation:<br><br>COMMENTS:<br>    Detainee in to see Nurse at this time. He states his lawyer needs a copy of his medical records and most recent lab results so that he can see a dermatologist for his vitiligo. He denies any pain or discomfort at present. Will refer to Nursing Supervisor.<br><br>Signature:<br>Electronically signed by Andrew Scott Lee, LPN on 06-20-2024 01:50:04 PM (Type: LPN) |
| **Vitals:** | Blood Pressure: 122/70<br>Temperature: 97.3<br>Pulse: 74<br>Pulse Oxygen: 99<br>Respirations: 20 |
| **Condition Related To:** | |
| **Dates:** | Current Illness Date:<br>1st Date Of Illness:<br>Unable To Work Dates:<br>Hospitalization Dates: |
| **Diagnosis:** | |
| **Procedures:** | |
| **Providers:** | Attending Provider: Lee, Andrew Scott, LPN, Allen Parish Sheriff's Office ID: |
| **Facility:** | Allen Parish Public Safety Complex |
| **Encounter Type:** | Nurse - Documentation Note |
| **Sign Off # 1** | Electronically signed by Andrew Scott Lee, LPN on 06-20-2024 01:50:04 PM (Type: LPN) |


157

37

| **Encounter** | | **06-22-2024 02:16 PM** |
|---|---|---|
| **KRASNOV, VLADISLAV** | **Unique ID# A249265983**   **Gender: Male** | **DOB 06-26-1998** |
| **Dictation:** | NURSE PROTOCOL - MISCELLANEOUS:<br><br>Name:              VLADISLAV KRASNOV<br>ID#:               A249265983<br>Date:              06-22-2024 Sat<br><br><br>ALLERGIES:<br>    No Known Drug Allergies<br>    No Known Food Allergy<br>    No Known Latex Allergy<br><br><br>CURRENT MEDICATIONS:<br><br>CURRENT MEDICATIONS:SYSTANE LUBRIC EYE DROPS, 1 SOL topical 2 times per day for 365 days<br><br>Interpreter ID#/Name:n/a<br>VITAL SIGNS:<br>Blood Pressure        125/81 mmHg<br>Temperature           97.9 °F / 36.61 °C<br>Pulse                 109 /minute<br>Respiration           18 /minute<br>Pulse Oxygen          98%<br><br>OBJECTIVE:<br>" I would like to speak to doctor about my skin disease as soon as possible, wanting a referral for dermatology  "<br><br>Pain Scale:<br>    0/10<br><br>OBJECTIVE:<br><br>Exam:<br>    Detainee not in acute distress. Vitiligo noted on hands and wrist. Detainee does not complain about pain at this moment.<br><br>ASSESSMENT DECISION:<br>    No need to contact provider, provider note states that he seen detainee on 6/04/24 and added no new orders or referral and will continue to monitor  skin condition.<br><br>PLAN: Education given to detainee about continuing to monitor condition and if skin condition worsens to leave sick call.<br>EDUCATION:<br>    Instructions to return if condition worsens or if no improvement.<br>        Patient states understanding.<br><br><br>CHARGES:<br>    No Charge - Nurse Sick Call Visit<br>ELECTRONIC SIGNATURE:<br><br>Electronic Signature:<br>Electronically signed by TAYLOR MCDANIEL, LPN on 06-22-2024 02:29:05 PM (Type: LPN)<br><br>Electronic Signature:<br>Reviewed and electronically signed by Latosha Morehead, RN on 06-25-2024 08:20:17 AM (Type: RN Review) | |
| **Vitals:** | Blood Pressure: 125/81<br>Temperature: 97.9<br>Pulse: 109<br>Pulse Oxygen: 98<br>Respirations: 18 | |
| **Condition Related To:** | | |


CorrecTek

158

30

## Allen Parish Sheriff's Office
### HEALTHCARE REQUEST (SOLICITUD DE SALUD)

Name (Nombre): _Vladislav Krasnov_       Date (Fecha): _05.13.24_

Social Security # (Número de seguridad social) _____

Alien # (Número de extranjero): _249 265 983_       DOB (Fecha de nacimiento): _06.26.98_

☑ Medical (Médico)   ☐ Mental Health (Salud mental)   ☐ Dental (Dental)   ☐ Other (Otro) _____

Nature of problem or request (be specific) Naturaleza del problema o solicitud (se específico):

_I'm need to speak with doctor about my chronic skin sickness because it's progressing (VITILIGO) fastest in my life._

---

### DO NOT WRITE BELOW THIS LINE          NO ESCRIBA DEBAJO DE ESTA LINEA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Vital Signs: Blood Pressure _____ Pulse _____ Respirations _____ Temperature _____ Pulse Ox _____

Received 05-14-24 @ 0500 - Jm

Triaged 05-14-24 @ 0515 - Nonurgent - Jm

Scheduled 05-14-24 @ 0600 - Jm

Completed 05-14-24 @ 1623 - Jm

☐ Treat with standing orders _____

Refer to:   ☐ ER _____

☐ PCP _____

☐ Mental Health _____

☐ Dentist _____

☐ Other _____

_JmcCallon, Lpn_          05-14-24   1623
Nurse Signature                Date/Time

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

***This is a confidential document and should only be placed in a designated area, medical box, or given directly to medical staff.***

136

KRASNOV, VLADISLAV
Unique ID# A249265983

| | |
|---|---|
| **Vitals:** | Blood Pressure: 122/78<br>Temperature: 97.1<br>Pulse: 92<br>Pulse Oxygen: 98<br>Respirations: 16 |
| **Condition Related To:** | |
| **Dates:** | Current Illness Date:<br>1st Date Of Illness:<br>Unable To Work Dates:<br>Hospitalization Dates: |
| **Diagnosis:** | |
| **Procedures:** | |
| **Providers:** | Attending Provider: McCallon, Tracey, LPN, ID: |
| **Facility:** | Allen Parish Public Safety Complex |
| **Encounter Type:** | Nurse - Sick Call |
| **Sign Off # 1** | Electronically signed by Tracey McCallon, LPN on 05-19-2024 01:12:15 PM (Type: LPN) |
| **Sign Off # 2** | Electronic Signature: Reviewed and electronically signed by Latosha Morehead, RN on 05-24-2024 08:09:08 AM (Type: RN Review) |

KRASNOV, VLADISLAV
Unique ID# A249265983

| Dictation: | |
|---|---|

```
NURSE PROTOCOL - MISCELLANEOUS:
Name:                    VLADISLAV KRASNOV
ID#:                     A249265983
Date:                    05-19-2024 Sun

ALLERGIES:
     No Known Drug Allergies
     No Known Food Allergy
     No Known Latex Allergy

CURRENT MEDICATIONS:
CURRENT MEDICATIONS:SYSTANE LUBRIC EYE DROPS, 1 SOL ophthalmic 2 times per day for 365 days  as
needed


Interpreter ID#/Name:Reference# 31336030
ID# 7516

VITAL SIGNS:
Blood Pressure           122/78 mmHg
Temperature              97.1 °F / 36.17 °C
Pulse                    92 /minute
Respiration              16 /minute
Pulse Oxygen             98%

OBJECTIVE:
I have pigmentation issues with my hands and arms, my vision is declining and the drops do not help
me, and I have some discomfort in my left side of lower jaw.

Pain Scale:

Pain Scale:
     4/10

OBJECTIVE:

Exam:
     Detainee came to exam room with no s/sx of distress or pain noted.  C/o pain to left side of
lower jaw and inflammation.  Also stated that the problem with his skin is getting worse.  The
pigmentation is missing from the elbows, hands and forearms on bilateral arms.  No redness or
irritation noted at this time.  Stated that he had the problem with his skin since he was in the 9th
grade but now it is spreading and getting worse.  Stated that his left eye is very discomfortable
and the drops are not helping him. No foreign object noted to eyes.  No redness or irritation noted
to eyes.

EDUCATION:
     Instructions to return if condition worsens or if no improvement.
          Patient states understanding.
     Instructed on medication, dosage, administration times, and expected outcome of each
medication.
          Patient states understanding.

ASSESSMENT DECISION:
No need to contact provider

PLAN:
     Order Type - Provider Visit
Instructions -
     SICK CALL
          Re-Check - Vision problems, skin pigmentation problems and pain to left jaw

CHARGES:
     No Charge - Nurse Sick Call Visit

ELECTRONIC SIGNATURE:
Electronically signed by Tracey McCallon, LPN on 05-19-2024 01:12:15 PM (Type: LPN)

Electronic Signature:
Reviewed and electronically signed by Latosha Morehead, RN on 05-24-2024 08:09:08 AM (Type: RN
Review)
```



KRASNOV, VLADISLAV
Unique ID# A249265983

| Order | 05-19-2024 01:10 PM |
|---|---|
| **KRASNOV, VLADISLAV**    Unique ID# A249265983    **Gender: Male**    **DOB** ▮▮-1998 | |
| Order: | Provider Visit |
| Instructions: | SICK CALL:<br>Re-Check - Vision problems, skin pigmentation problems and pain to left jaw |
| Status: | Completed |
| Entered by: | TMCCALLON |
| Approval Status: | Pending |
| Approved/Rejected on: | |
| Approved/Rejected by: | |
| Requested Start Date: | Sun 05-19-2024 |
| Requested Start Shift: | Midday |
| Requested End Date: | Sat 05-25-2024 |
| Requested End Shift: | Midday |
| Actual Start Date: | Mon 05-20-2024 |
| Actual Start Shift: | Midday |
| Actual End Date: | Mon 05-20-2024 |
| Actual End Shift: | Midday |
| Renewal Date: | |
| Assigned to: | |
| Requesting Provider: | Tracey McCallon, LPN |
| Supervising Department: | Medical |
| Implementation Department: | Medical |
| Verbal Order?: | No |
| Verbal Order Type: | |
| Facility: | Allen Parish Public Safety Complex |
| Discontinued by: | |
| Comments: | |


141

**Exhibit H — Letters of Support**

PETITION FOR WRIT OF HABEAS CORPUS (28 U.S.C. § 2241), AND DECLARATORY AND

INJUNCTIVE RELIEF

From: Dmitry Grigorenko
RUSSIAN SEATTLE FOR FREEDOM
UBI 605 205 246
EIN 93-3120252
18030 30 AVE SE
Bothell WA 98012

March 26, 2026

**Re: Support for Vladislav Krasnov** ▮

To whom it may concern,

I am writing in full support of **Mr. Vladislav Krasnov (A#** ▮, who is currently held in immigration detention and is under consideration for release. After reviewing the circumstances of his case, and consistent with our organization's mission to assist individuals fleeing persecution, Russian Seattle for Freedom strongly supports his release. Vladislav has also volunteered with our organization, demonstrating his commitment to helping others and contributing to the community. We stand ready to assist him with his post-release resettlement and ongoing support.

Should Mr. Krasnov be released and choose to relocate to Washington State, Russian Seattle for Freedom is prepared to provide a comprehensive range of assistance, including:

- **Housing and Material Assistance:** Help securing temporary or long-term housing through our community network.
- **Cultural and Social Integration:** Connection with members of the local Russian-speaking diaspora, participation in mutual aid networks, and access to community-led events.
- **Language and Orientation Support:** Referrals to English language classes, translation services, and guidance in navigating local systems and resources.
- **Community Support:** Access to an established, supportive network experienced in helping newly arrived immigrants.

Based on our organizational experience and community capacity, we are confident that Mr. Krasnov will successfully rebuild his life and make positive contributions to the broader community if given the opportunity. We respectfully request your favorable consideration of his release.

Thank you for your attention to this matter.

Sincerely,
Dmitry Grigorenko,
President
4252479074
info@RussianSeattleForFreedom.org



# RUSSIAN AMERICA FOR DEMOCRACY IN RUSSIA

Boston ● New York ● Philadelphia ● Washington DC ● Atlanta ● Charlotte ● Miam-
Tallahassee ● Ann Arbor ● Chicago ● Houston ● Denver
Seattle ● Portland ● Sacramento ● San Francisco ● Los Angeles ● San Diego

6218 Georgia Avenue NW Suite #1, PMB 3078, Washington, DC, 20011, United States

March 26, 2026

**RE: Letter of Support for Mr. Vladislav Krasnov ▮▮▮▮▮▮▮ — Habeas Corpus Petition and Bond Hearing**

To the Honorable Court and Reviewing Authorities:

My name is Dmitry Valuev, I am the president of Russian America for Democracy in Russia (RADR), a diaspora organization of pro-democracy Russians in the US (https://democracy4russia.org). Our organization unites 16 communities in the U.S. and focuses on strengthening a pro-democracy Russian-American community, supporting the democratic movement, human and civil rights in Russia by engaging Russian Americans in community development, educational outreach, fundraisings, and advocacy.

Russian America for Democracy in Russia (RADR) respectfully submits this letter in full support of Mr. Vladislav Krasnov (Alien Registration Number A249 265 983) in connection with his pending habeas corpus petition and any forthcoming bond hearing. Mr. Krasnov, a national of Russia and a pro-democracy and anti-Putin activist, sought asylum in the United States and was taken into immigration detention on February 11, 2026. He has remained in custody at the Desert View detention facility in Adelanto, California, for the duration of these proceedings.

Mr. Krasnov has no prior criminal history, no record of failing to appear for immigration proceedings, and no established history of posing a danger to persons or property. His continued civil detention therefore lacks a compelling governmental justification. In light of these facts, RADR respectfully urges this Court and the relevant authorities to order Mr. Krasnov's release, so that he may await the resolution of his immigration case in the community rather than in continued confinement.

Following his prior release from immigration detention in 2024, Mr. Krasnov remained actively engaged with RADR as a volunteer, demonstrating a strong commitment to supporting others in similar circumstances. In this capacity, he assisted Russian pro-democracy and anti-war asylum seekers held in U.S. immigration detention who face a risk of persecution if returned to Russia. His contributions included conducting background research, facilitating communication, and coordinating efforts with Russian human rights defenders and partner organizations. Through this work, Mr. Krasnov has shown reliability, compassion, and a deep understanding of the challenges faced by asylum seekers, further underscoring his positive character and strong ties to the community.

Following a careful review of Mr. Krasnov's background and circumstances, RADR wishes to formally commit to providing him with comprehensive support immediately upon his release. We are fully prepared to assist him in establishing stability, maintaining compliance with all immigration conditions, and becoming a productive and engaged member of his community. Specifically, RADR's support will include the following:

- **Economic Integration:** Enrollment in RADR's workforce development program, including resume preparation, job search assistance, interview coaching, and potential placement through our network of over 75 employer partners. We will also assist Mr. Krasnov in understanding his individual work authorization and connecting with any applicable employment authorization filing processes.

- **Housing and Basic Needs:** Assistance in identifying safe and affordable transitional housing, and referrals to food, clothing, and emergency assistance programs as needed to ensure stable living conditions while his case proceeds.
- **Cultural and Social Integration:** Pairing with a Russian-American mentor family, participation in cultural orientation workshops, and connection to a diaspora community of more than 3,000 individuals. This community network will reduce Mr. Krasnov's risk of social isolation — a known risk factor for noncompliance — and reinforce his ties to the United States while his petition is pending.
- **Educational Support:** Access to English-language classes, vocational training, and guidance regarding higher education and professional credentialing opportunities, empowering Mr. Krasnov to build long-term self-sufficiency.
- **Immigration Compliance Support:** Assistance in tracking and attending all scheduled immigration hearings and check-ins, coordination with Mr. Krasnov's legal counsel, and help ensuring timely compliance with any conditions of release or supervision imposed by the Court or DHS.

Based on RADR's review of Mr. Krasnov's background, we have found no indicators that he poses a flight risk or a danger to the community. He has no criminal record of any kind, no prior adverse immigration history, and no established ties to any organization or activity that would suggest a risk of harm. Mr. Krasnov's decision to present himself at a port of entry and formally apply for asylum is itself a strong indicator of his intent to engage with the legal process in good faith. The presence of RADR's comprehensive support network further mitigates any conceivable flight risk, as it provides him with stable housing, income assistance, social support, and compliance infrastructure from the moment of his release.

RADR respectfully urges this Court and the relevant reviewing authorities to grant Mr. Vladislav Krasnov's release from detention. His prolonged civil confinement is unnecessary given his lack of criminal history, his good-faith engagement with the asylum process, and the robust support network that stands ready to receive him in the community. Releasing Mr. Krasnov will allow him to pursue his case with dignity, in freedom, and with the full assistance of our organization. We are committed to supporting him at every stage of this process.

We are available to provide any additional information, supplemental documentation, or testimony this Court or DHS may require. Please do not hesitate to contact us at the information below.

Respectfully submitted,

President
Russian America for Democracy in Russia
dv@democracy4russia.org | +1-571-438-1868

Dmitry Valuev

2

Sponsor name: Abigail Duhon
Email: abigailduhon@gmail.com
Phone: 504.6448843
Address: 533 S Ogden Dr. Los Angeles, CA 90036

Declaration Of Abigail Duhon, in Support of the Release of Vladislav Krasnov

I make this statement in support of Vladislav Krasnov.
I am writing to respectfully request the release of Vladislav Krasnov
into my custody while his immigration case is under review.

I am a U.S. citizen, and Vladislav and I have developed a warm and close personal friendship. We met in Los Angeles last year. Through our communication, I have come to know him as a sincere, attentive, and kind person.

Vladislav has treated me with respect, patience, and care. During difficult moments, he has been a source of support for me, remaining thoughtful and compassionate. He has connected with my mother as well, who says she views him like a son and cares about his safety a great deal as well.

Based on my personal experience, he does not pose a danger to others.
He is a peaceful person who expresses his beliefs in a calm and non-violent manner.

It's difficult for me to know that he is currently being held in detention. I know this situation is affecting him emotionally and mentally, and I am deeply concerned about his physical well-being if his detention continues.

I am also aware that Vladislav has an autoimmune condition, vitiligo, which may worsen under stress. I can see that his current condition and the circumstances of detention are having a negative impact on his health, and this raises additional concern for his well-being.

If Vladislav is released, he will have support and access to stable and safe living conditions. If necessary, I am willing to support him in arranging housing accommodation and provide general support as he settles in, so that he can go through this period in a stable and dignified way.

I would also like to note that Vladislav takes his obligations with immigration authorities seriously. I have personally accompanied him to scheduled check-ins and have seen that he complies with all requirements in a responsible and good-faith manner. Based on my experience, I have no doubt that he will continue to comply with all conditions and will not attempt to evade the process.

I understand that the Court must consider many factors, and I simply wanted to share my personal perspective of Vladislav as a person.

I respectfully ask the Court to consider his release while his case is pending.

I declare under penalty of perjury that the foregoing is true and correct.

Sincerely,
Abigail Duhon
March 26, 2026





**Exhibit I — Form I-220B**

33

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

**ORDER OF SUPERVISION**

File No: ▮▮▮▮▮▮

Date: OCT 1 8 2024

Name: Krasnov, Vladislav

On _____06/26/2024_____, you were ordered:
(Date of Final Order)

☐ Excluded or deported pursuant to proceedings commenced prior to April 1, 1997.

☒ Removed pursuant to proceedings commenced on or after April 1, 1997.

Because the agency has not effected your deportation or removal during the period prescribed by law, it is ordered that you be placed under supervision and permitted to be at large under the following conditions:

☒ That you appear in person at the time and place specified, upon each and every request of the agency, for identification and for deportation or removal.

☒ That upon request of the agency, you appear for medical or psychiatric examination at the expense of the United States Government.

☒ That you provide information under oath about your nationality, circumstances, habits, associations and activities and such other information as the agency considers appropriate.

☒ That you do not travel outside _____Callifornia_____ for more than 48 hours without first having notified
(Specify geographic limits, if any)
this agency office of the dates and places, and obtaining approval from this agency office of such proposed travel.

☒ That you furnish written notice to this agency office of any change of residence or employment 48 hours prior to such change.

☒ That you report in person on _____November 12, 2024, @ 08:00 a.m._____ to this agency office at:
(Dav/Date/Time)
ERO San Diego, 880 Front Street, Suite 2242, San Diego, CA 92101, / P: 619-436-0410
(Reporting Address)

☒ That you assist U.S. Immigration and Customs Enforcement in obtaining any necessary travel documents.

☒ Other: Call ERO San Diego, 619-436-0410, upon release for further reporting instructions.

☒ See attached sheet containing other specified conditions (Continue on separate sheet if required)

_____
(Signature of ICE Official)

Jacques T. Metoyer          AFOD
_____
(Print Name and Title of ICE Official)

---

**Alien's Acknowledgement of Conditions of Release under an Order of Supervision**

I hereby acknowledge that I have (read) (had interpreted and explained to me in the _____English_____ language) the contents of this order, a copy of which has been given to me. I understand that failure to comply with the terms of this order may subject me to a fine, detention, or prosecution.

AO10996
_____
(Signature of ICE Official Serving Order)

_____
(Signature of Alien)

10-24-24
_____
Date

Page 1 of 4

ICE Form I-220B (08/10)

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

## ORDER OF SUPERVISION (Continuation Page)

| | | Picture | Right Index Print |
|---|---|---|---|
| Alien's Name | Krasnov, Vladislav | | |
| File Number | ███████████ | | |
| Date | | | |
| Alien's Signature | | | |
| Alien's Telephone Number (if applicable) | 619-502-1371 | | |
| Alien's Address | 2428 Wilbur Ave, San Diego, CA 92109 | | |

### PERSONAL REPORT RECORD

| Date | Officer | Comment/Changes |
|---|---|---|
| 10·30·24 | Richardson | checked in (early). Next check-in Feb 11, 2025 at 10:00 AM at SAC. |
| 02/11/2025 | B | Next RP February 11, 2026. |
| | | |

| Signature | Title |
|---|---|
| | |

Page 2 of 4

ICE Form I-220B (08/10)

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

## ORDER OF SUPERVISION (Addendum)

File No: ▓▓▓▓▓▓▓▓

Date: __OCT 1 8 2024__

Name: Krasnov, Vladislav

☒ That you do not associate with know gang members, criminal associates, or be associated with any such activity.

☐ That you register in a substance abuse program within 14 days and provide ICE with written proof of such within 30 days. The proof must include the name, address, duration, and objectives of the program as well as the name of a counselor.

☐ That you register in a sexual deviancy counseling program within 14 days and provide ICE with written proof of such within 30 days. You must provide ICE with the name of the program, the address of the program, duration and objectives of the program as well as the name of a counselor.

☐ That you register as a sex offender, if applicable, within 7 days of being released, with the appropriate agency(s) and provide ICE with written proof of such within 10 days.

☒ That you do not commit any crimes while on this Order of Supervision.

☒ That you report to any parole or probation officer as required within 5 business days and provide ICE with written verification of the officer's name, address, telephone number, and reporting requirements.

☒ That you continue to follow any prescribed doctor's orders whether medical or psychological including taking prescribed medication.

☒ That you provide ICE with written copies of requests to Embassies or Consulates requesting the issuance of a travel document.

☒ That you provide ICE with written responses from the Embassy or Consulate regarding your request.

☒ Any violation of the above conditions will result in revocation of your employment authorization document.

☒ Any violation of these conditions may result in you being taken into Service custody and you being criminally prosecuted.

☒ Other: That you report to that ICE office thereafter on the 1st business day of the month until otherwise directed by the Immigration and Customs office at

ERO San Diego, 880 Front Street, Suite 2242, San Diego, CA 92101, / P: 619-436-0410

ICE Form I-220B (08/10)

**PROOF OF SERVICE**

I am over the age of eighteen and not a party to this action. My business address is

440 Western Ave. Suite 205 Glendale, CA 91201.

On March 30, 2026, I served the foregoing **PETITION FOR WRIT OF HABEAS CORPUS (28 U.S.C. § 2241), AND DECLARATORY AND INJUNCTIVE RELIEF** on the following by [CM/ECF electronic filing and/or U.S. Mail / Certified Mail / email]:

U.S. Attorney's Office
Central District of California
312 N. Spring Street
Los Angeles, CA 90012

Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

ICE Field Office Director- Los Angeles Field Office
U.S. Immigration and Customs Enforcement
300 North Los Angeles Street, Room 7631
Los Angeles, CA 90012

Facility Director
Desert View Annex / Adelanto ICE Processing Center
10450  Rancho Road
Adelanto, CA 92301

I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

Executed on March 30, 2026 at Glendale, CA.

*Sarah Hacobian*
Sarah Hacobian

34